[No. 27836.  *En Banc.*  January 13, 1941.]

JOHN A. SCHOLZ et al., *Respondents*, v. MAIDEN LEUER
et al., *Appellants.*[1]

[1]Reported in 109 P. (2d) 294.

*Shank, Belt, Rode & Cook,* for appellants.

*H. E. T. Herman* and *Richard S. Munter,* for respondents.

Driver, J.—Plaintiffs brought this action to recover damages for the death of their minor daughter, who sustained fatal injuries when the automobile in which she was riding collided with a truck.

Defendants' counsel, in order to narrow the issues at the trial, formally admitted in open court that James Gale, the driver of the automobile, was guilty of ordinary negligence, which proximately caused the girl's death. At the conclusion of the plaintiffs' case, the defendants also rested without offering any evidence. The jury returned a verdict for the plaintiffs. The defendants seasonably moved for directed verdict, for judgment notwithstanding the verdict, and for a new trial, all of which motions were denied. From a judgment entered on the verdict, the defendants have taken this appeal.

It was appellants' sole contention on their motion for a directed verdict, and it is their principal contention on this appeal, that, under the evidence, respondents were precluded from recovery by the Laws of 1937, chapter 189, p. 911, § 121 (Rem. Rev. Stat., Vol. 7A, § 6360-121 [P. C. § 2696-879]), the host and guest statute, which provides:

"No person transported by the owner or operator of a motor vehicle as an invited guest or licensee, without payment for such transportation, shall have cause of action for damages against such owner or operator for injuries, death or loss, in case of accident, unless such accident shall have been intentional on the part of said owner or operator: . . ."

The pertinent facts may be summarized as follows:

In December, 1938, appellants John Leuer and Maiden Leuer married and went on a honeymoon trip. Mrs. Leuer then owned and operated an agency for the delivery of a daily newspaper on a route just outside the northerly city limits of Spokane. During

her absence, with the use of her automobile, her nephew, appellant Gale, delivered the newspapers on this route. He started to make deliveries on December 25th (Mrs. Leuer accompanied him that day) and continued to do so daily to and including the ensuing January 1st.

Respondents' daughter, Evelyn Scholz, a fourteen year old, first-year high school girl, resided with her parents on a farm near Garfield, Washington. On Saturday, December 31st, Mrs. Scholz took Evelyn and her younger sister to Spokane for their respective piano and dancing lessons, and, late in the afternoon, they all went to the home of appellant Maiden Leuer, Mrs. Scholz's sister, to spend the night. Mrs. Leuer had not yet returned, but her mother and appellant Gale apparently were residing there during her absence.

Mrs. Scholz was the only witness who testified as to what transpired that evening. She stated, on direct examination, that appellant Gale and Evelyn had retired sometime near eight o'clock, but she did not go to bed until about eleven o'clock; that Evelyn, who occupied the same bed with her, was then asleep; that before Gale had retired, "He asked that Evelyn might go with him in the morning with the papers," but Mrs. Scholz told him she "would see"; that she had been awakened a little before midnight by the ringing of an alarm clock in the adjoining room, and very soon thereafter appellant Gale came to her door. Her testimony as to the conversation which then ensued was as follows:

"Q. Then relate to the Court and jury just what was said between you and Jim at that time, what he said to you and what you replied to him. A. Well, he asked me if Evelyn could go with him and I said, 'Well, you don't need her.' I hated to awaken her in her sleeping. He said that she could help him on the route, for me to let her go, so I called her then. He

said she could read the names of the carriers [customers] and would save him stopping to get the order of them. . . . Q. Now, thereafter, after you had this conversation which you related with Jim, what, if anything, did you do in regard to awakening Evelyn? A. I nudged her with my elbow and called her. Q. Did she awaken? A. Yes. Q. Did she leave then with Jim? A. Yes, they left then."

On cross-examination, Mrs. Scholz testified that, before they arrived at Mrs. Leuer's home, Evelyn had expressed a desire to go out somewhere on New Year's Eve and had particularly mentioned a public dance in Spokane, but she had declined to give her consent; that, sometime Saturday evening, Evelyn had suggested to appellant Gale that they go to a show, but he replied that he did not know the Sunday route very well, and he preferred to retire early in order to have "a clear mind" to deliver the papers.

Mrs. Scholz further testified, on cross-examination, as follows regarding the conversation which she had with appellant Gale when he came to the door of her room at midnight:

"Q. Do you recall just what it was he said? Did he ask you if you had made up your mind whether you were going to let her go, or ask you if she could go now, or what? A. Well, I think he came expecting me to wake her up to go with him. Q. And then he asked you if you were going to let her go, or words to that effect? A. Yes. Q. And it was at that time, then, that you made the statement, as I recall your testimony yesterday, something to the effect that he didn't need her or she would just be in the way, or something like that? A. Well, she wouldn't need to go, mostly because I hated to wake her up. Q. Do you recall just exactly what it was you said there? A. I think I said, 'Jim you don't need her to go with you,' is about the words I used. Q. And then, as I understand you, he said, 'Well, I would like to have her go, she could help me by reading the book,' or something

like that? A. Yes, he said he wasn't familiar with the Sunday route and it would save him stopping to see the names of the next customers. He said she could help him by reading the names on the route book. Q. That was advanced as sort of an argument to you to allow her to go, wasn't it? A. Yes. Q. Well, what happened then? Did you decide you were going to allow her to go? A. That was my final decision. If there had been any snow or the weather bad, I wouldn't have allowed her to go, but the weather was good and I thought there really wasn't any reason why she shouldn't go. Q. You knew she wanted to go? A. Yes. Q. So, then you awakened her, did you? A. Yes. Q. And what did you tell her, Mrs. Scholz? A. I just asked her if she wanted to go. Q. What did she have to say? A. 'Sure.' Q. And then I presume she got up and dressed? A. Got up and left, yes. Q. Was there any other conversation there between you and Jim Gale or Evelyn? A. Well, my mother was there and I asked her if she thought it was safe to let her go and she said she did, they had never had any accident on the route. Q. That was all that was said there that evening? A. Yes, as I remember."

Appellant Gale testified substantially as follows regarding the assistance which Evelyn gave him on the paper route:

He drove the car, and Evelyn sat beside him. The newspapers were carried on the back seat in bundles of twenty-five, which were brought forward one at a time as needed and placed on Evelyn's lap. She also held the route book, in which the names of the customers were listed, one on each page in the sequence in which they were to be served. As they drove along, she leafed through this book and read off the names in order. The papers were delivered in the usual way, by depositing them in the tubular boxes which had been set up beside the highway for their reception. When a box was on Evelyn's side of the highway, she would open the car window, reach out and insert the

paper; and if a box was on his side, appellant Gale would do likewise. Whenever her hands were engaged with the papers, Evelyn would place the route book upside down on the open lid of the glove compartment directly in front of her. As they were proceeding in this manner, at about two o'clock in the morning, appellant Gale brought the automobile in which they were riding into collision with the rear end of a truck, and Evelyn sustained the injuries which resulted in her death.

Appellants contend that it should be held, as a matter of law, that the restrictive provisions of the host and guest statute apply, because, they say, Evelyn went upon the trip for her own enjoyment, it being the only means open to her for the celebration of the New Year; the services she rendered were only an incidental, reciprocal favor on her part; and, above all, "the very essential element of a previous contract" necessary to take a rider in a motor vehicle out of the operation of the statute, was wholly lacking.

Respondents, on the other hand, maintain that appellant Gale took Evelyn with him primarily for the purpose of assisting him with his work, her carriage was chiefly to his advantage, and she did not, therefore, come within the bar of the host and guest statute under what may be called the benefit rule, which is concisely stated in the following paragraph from 4 Blashfield, Cyclopedia of Automobile Law and Practice (Perm. ed.), 80, § 2292:

"One important element in determining whether a person is a guest within the meaning and limitations of such statutes is the identity of the person or persons advantaged by the carriage. If, in its direct operation, it confers a benefit only on the person to whom the ride is given, and no benefits, other than such as are incidental to hospitality, companionship, or the like, upon the person extending the invitation, the

passenger is a guest within the statutes; but, if his carriage tends to the promotion of mutual interests of both himself and the driver and operates for their common benefit or if it is primarily for the attainment of some objective or purpose of the operator, he is not a guest within the meaning of such enactments."

In support of their contention that a previous contract is necessary to avoid the host and guest statute, appellants cite, and particularly rely upon, *Eubanks v. Kielsmeier,* 171 Wash. 484, 18 P. (2d) 48, and *Carboneau v. Peterson,* 1 Wn. (2d) 347, 95 P. (2d) 1043. Both of those cases were concerned principally with the subject of joint adventure. In each of them, the court was called upon to determine whether the relationship between the driver of an automobile and an injured occupant was one of host and guest or of joint adventure. The court found, in each case, that the essential elements of a joint adventure had not been established, and, accordingly, applied the old gross negligence rule as the measure of the driver's liability in the *Eubanks* case, which was decided before the enactment of the host and guest statute, and invoked the "intentional accident" test prescribed by the statute in the *Carboneau* case.

In the latter case, it was said that a contract, express or implied, is an essential element, in fact the very *"sine qua non,"* of the relationship of joint adventure; but such relationship is by no means the only available medium of avoidance of the host and guest statute. A person transported in the automobile of another may be without the bar of the statute and yet not be engaged in a joint adventure. *Buss v. Wachsmith,* 190 Wash. 673, 70 P. (2d) 417, 193 Wash. 600, 74 P. (2d) 999.

When the court is called upon to decide whether or not the statute applies to a certain factual situation,

the problem, after all, is not primarily to classify or definitely identify the relationship between the operator and the occupant, but to determine whether or not the occupant was an invited guest or licensee within the purview of the statute. For the purposes of the instant case, the meaning of the words "invited guest or licensee" can best be ascertained by considering them in connection with the phrase which immediately follows in the statute, that is, "without payment for such transportation." The qualifying phrase limits the scope of "invited guest or licensee" by indicating plainly that gratuitous carriage only is intended. If there is payment for the transportation, the statute does not apply, and this does not mean that payment must necessarily be made in money. It is sufficient if the presence of the occupant directly compensates the operator or owner in a substantial and material or business sense, as distinguished from mere social benefit or nominal or incidental contribution to expenses.

Such is the construction which the courts in other jurisdictions have generally given to host and guest statutes substantially similar to the Washington statute. *Sumner v. Edmunds,* 130 Cal. App. 770, 21 P. (2d) 159; *McCann v. Hoffman,* 9 Cal. (2d) 279, 70 P. (2d) 909; *Russell v. Parlee,* 115 Conn. 687, 163 Atl. 404; *Knutson v. Lurie,* 217 Iowa 192, 251 N. W. 147; *Thomas v. Currier Lumber Co.,* 283 Mich. 134, 277 N. W. 857; *Haas v. Bates,* 150 Ore. 592, 47 P. (2d) 243; *Albrecht v. Safeway Stores,* 159 Ore. 331, 80 P. (2d) 62.

This court held in *Dahl v. Moore,* 161 Wash. 503, 297 Pac. 218, and *Hart v. Hogan,* 173 Wash. 598, 24 P. (2d) 99, where the gross negligence rule was involved, that a rider in an automobile was not a guest if his carriage conferred a tangible benefit on the driver and operated to their mutual advantage. Subsequent to

the enactment of the host and guest statute, the court, in *Buss v. Wachsmith, supra,* held that the statute did not apply where the driver of the car and the injured rider were fellow servants (or master's vice-principal and servant, respectively).

In *Syverson v. Berg,* 194 Wash. 86, 77 P. (2d) 382, and *Fuller v. Tucker,* 4 Wn. (2d) 426, 103 P. (2d) 1086, the court held that the host and guest statute precluded recovery by the person transported under the circumstances there presented, but the requirements necessary to constitute payment for transportation such as to avoid the bar of the statute were specifically delineated. Such requirements are (1) actual or potential benefit in a material or business sense resulting or to result to the owner or occupant; and (2) that the transportation be motivated by the expectation of such benefit. It will be noted that these essential requirements, which are not, of course, intended to affect the joint adventure rules of the *Carboneau* case, do not include a previous contract or understanding between the parties relative to compensation for the carriage.

Applying these principles to the case at bar, it seems apparent that Evelyn's services were such as to confer upon appellants a substantial business benefit. Appellant Gale had 212 Sunday papers to deliver on a suburban route after midnight on New Year's day. There were approximately sixty more papers to deliver on Sunday than on week days, and he was not very familiar with the Sunday route. He had carried it at times in prior years, but had been over it only once before that season, on Christmas day, when Mrs. Leuer was with him. News is an ephemeral commodity, and timely delivery is a prime essential to the successful operation of a newspaper route. Manifestly, Evelyn's services expedited and facilitated the deliv-

eries of the newspapers by appellant Gale and, there-fore, constituted a tangible benefit to him and to his employer. Was the expectation of this benefit, then, the motivation or actuating consideration which in-duced appellant Gale to take Evelyn with him on the trip? That is the crucial question in the case so far as the host and guest statute is concerned.

It should be borne in mind, in this connection, that Evelyn was a fourteen year old girl, living with her parents, and, in the absence of her father, under the direction and control of her mother. All arrangements for her to accompany appellant Gale were made by him directly with the mother. Evelyn could not have gone without her mother's consent. He solicited such consent and finally obtained it on the representation that he needed Evelyn to help him with his work. The fact that Evelyn wanted to go, and that she may have regarded the venture somewhat as a New Year's lark, was, under the circumstances, of little moment, the in-tention and purpose of her mother and appellant Gale being the controlling factors. That the trial court took this view of the situation, is indicated by the following excerpt from its ruling on the motion for directed verdict:

"It is true that her parents were her directors and had control of her time and of her going and coming, and even if Evelyn had agreed with Mr. Gale to go with him and for the very purpose that it is contended here she was to go with him, that would be no controlling fact in the matter because the parents might have gone counter to her wishes and they might have said, just as her mother did say as to other things she wanted to do, that she couldn't. . . .

"But looking at it from the other point of view, namely, that the parents were the determiners of whether she should make the trip and the purpose for which she should make it, I think it is very clear that she was not merely a guest, but she was a helper. She

was doing a service which this young man desired to have her do, even though childlike she might have been ready and willing to get up at midnight and go on a not very exciting or exhilerating journey.

"I think the facts here make such a case as the jury should be permitted to pass upon."

■ Where, as in the case at bar, the sufficiency of the evidence is questioned, the evidence should be interpreted most strongly against the defendant and in the light most favorable to the plaintiff. The verdict of the jury should be permitted to stand if, so interpreted, there is any substantial evidence, or reasonable inference from the evidence, to sustain it. This principle is so well established in this jurisdiction as to scarcely require citation of supporting authority. Typical and comparatively recent expressions of the court appear in *Buttnick v. J. & M., Inc.,* 186 Wash. 658, 59 P. (2d) 750; *Holm v. Investment & Securities Co.,* 195 Wash. 52, 79 P. (2d) 708; *Beck v. Dye,* 200 Wash. 1, 92 P. (2d) 1113; *Rice v. Garl,* 2 Wn. (2d) 403, 98 P. (2d) 301.

■ If the rule just stated means anything at all in a case such as this, it means that the jury had the right to determine the relative weight and emphasis to be given the direct examination and the cross-examination of Mrs. Scholz, and, viewing her testimony in the light most favorable to the respondents and within the bounds of reasonable inference, to render its verdict accordingly. Thus considered, the testimony warrants the reasonable inference that the moving consideration which induced appellant Gale to take Evelyn with him on the paper route was the expectation of the assistance which she would give him in the delivery of the newspapers. Evelyn was not, therefore, a guest without payment for her transportation within the meaning of the host and guest statute.

An analysis of the cases from other jurisdictions construing host and guest statutes, would unduly extend this opinion and will not be undertaken. The following authorities, although severally differing somewhat in factual detail from the case at bar, are considered to be substantially apposite in supporting the conclusion that the host and guest statute is not applicable to the instant case: *Goldberg v. Cook,* 206 Minn. 450, 289 N. W. 512; *Dorn v. North Olmsted,* 133 Ohio St. 375, 14 N. E. (2d) 11; *George v. Stanfield,* 33 Fed. Supp. 486; *Haney v. Takakura,* 2 Cal. App. (2d) 1, 37 P. (2d) 170; *Albrecht v. Safeway Stores,* 159 Ore. 331, 80 P. (2d) 62, *supra.*

Appellants assign as error the entry of judgment against Maiden Leuer and against the marital community composed of Maiden Leuer and John Leuer, her husband. They maintain that there is no evidence that appellants Leuer authorized appellant Gale "to employ any assistant or even to take on a passenger"; hence, as to them, Evelyn was a trespasser in the automobile driven by Gale, and they were nowise liable for her wrongful death.

It was alleged in the complaint, and admitted by the answer, that the newspaper delivery service and the automobile used in its operation were the sole and separate property of Maiden Leuer, and that, during the night of December 31, 1938, and the morning of January 1, 1939, she had employed appellant Gale "to conduct the delivery of said newspapers for her." The essence of the business of operating a suburban newspaper route is the delivery of the newspapers. Therefore, it may be said that, by the pleadings, it was admitted, in effect, that, during the time in question, appellant Gale was employed by Mrs. Leuer to conduct her newspaper delivery business for her. "Conduct," according to Webster's Unabridged New International

Dictionary (2d ed.), means "to have the direction of; to manage; to direct; to carry on."

The undisputed testimony was to the effect that, at the time of the accident, appellant Maiden Leuer was away from Spokane, and, in her absence, appellant Gale had sole charge and control of her paper-route business. One who has been employed to manage a business has broad and liberal implied powers with respect thereto, including, *inter alia,* in the absence of an agreement to the contrary, authority to make contracts which are incidental, usual, or reasonably necessary in the conduct of the business; to engage and supervise such employees as may reasonably be required; and to direct the ordinary operations of the business. 1 Restatement of the Law of Agency, 173, § 73; 2 Am. Jur. 154, § 195. Appellant Gale, as acting manager of the paper-route business, had implied authority to take Evelyn with him as a helper.

But there is another reason for upholding the judgment against appellant Maiden Leuer. It applies likewise to the judgment against the marital community and will also be discussed in that connection.

Throughout the proceedings in the trial court, the appellants were all represented by the same counsel, and pleaded jointly. They did not demur to the complaint on behalf of the community, nor did they move for dismissal of the community as a misjoined party pursuant to the provisions of Rem. Rev. Stat., § 308-2 [P. C. § 8676-5]. In the affirmative defense set forth in their joint answer, they alleged that "the said Evelyn Scholz was riding in said Plymouth automobile *as the guest of these defendants,* . . ." (Italics ours.) At the conclusion of the respondents' case, appellants' counsel moved for a directed verdict and, in support thereof, stated:

"We move the Court to direct the jury to return a verdict in favor of the defendants on the ground that the evidence as it now stands, in our judgment, shows that the deceased, Evelyn Scholz, occupied the status of a guest in the car at the time of the accident, and there is no evidence of intentional injury, nor even any claim of such in the pleadings. The only question in the lawsuit, as the Court can readily see, at this stage of the case is the question of the status of Evelyn Scholz at the time of the accident. If she was a guest, I think counsel concede that there is no case to go to the jury. MR. MUNTER: That is correct. MR. COOK: On the other hand, if she occupied a status which entitles her parents to recover upon proof of ordinary negligence, then, in my judgment, it is the duty of the Court to instruct the jury to return a verdict for the plaintiff and assess the damage."

The trial court evidently took this statement of counsel at its face value, for, in ruling on the motion, it commented only on the question of the status of Evelyn, and, in instruction No. 3, advised the jury that such question was the only one submitted for their determination other than the amount of damages. Not only this instruction, but also the instructions in their entirety submitted the case on the theory that the jury should find for or against the appellants as a whole. No exceptions were taken to the instructions in this respect. Instructions to which no exceptions are taken become the law of the case. *Lally v. Graves*, 188 Wash. 561, 63 P. (2d) 361, and cases therein cited.

The appellants did not, in their joint motions for judgment notwithstanding the verdict and for a new trial, nor, so far as the record shows, in any other way, request or suggest that the court differentiate between the appellants Leuer and appellant Gale in the entry of judgment. The appellants may not now broaden the issues by objecting to the judgment against Maiden Leuer and against the marital community on grounds

that were not called to the attention of the trial court. The pertinent rule is stated in 4 C. J. S. 480, § 241, as follows:

"Where a case is tried without objection, upon the theory that the only issue is as to one question of fact, a party cannot urge, in the appellate court, that the evidence upon some other question of fact was insufficient to justify the verdict, and when parties submit a cause upon a single hypothesis, and expressly or impliedly agree that that point shall be the only issue in the case, review on appeal is limited to the single issue."

See, also, *Belcher v. Young,* 90 Wash. 303, 155 Pac. 1060; *Mielke v. Miller,* 100 Wash. 119, 170 Pac. 143.

The appellants next contend that the trial court erred in giving its instruction No. 3. In that instruction, after advising the jury of the issues submitted for their determination, the court further instructed them:

"If you should find from a fair preponderance of the evidence that the status of said Evelyn Scholz was that of a mere invited guest or licensee, then there can be no recovery of damages by the plaintiffs and your verdict should be for the defendants.

"But if you find that the situation of said Evelyn Scholz was not that of an invited guest or licensee but that her relation to the operator of the car was such as exists between a passenger and the operator of an automobile as a result of which tangible benefits accrue to the operator from the transportation by saving his time or facilitating his work, then your verdict must be for the plaintiffs."

The grounds of appellants' objection to the instruction are stated in their exceptions taken thereto at the trial as follows:

"The mere fact that benefits accrue to the operator of the car from the transportation is not in our judgment sufficient to invoke what is known as the benefit doctrine. But that is only one of the elements. Be-

fore a person is entitled to invoke such doctrine, a contract or agreement must be proved, as the rights of the plaintiff invoking such a doctrine sound in contract."

What has heretofore been said with reference to the benefit rule in relation to the host and guest statute, disposes of this contention of the appellants. As has been pointed out, where the relationship between the driver of a car and an occupant is not that of joint adventure, a prior contract between them is not essential to avoid the bar of the statute under the benefit rule.

■ Finally, appellants complain of the amount of the verdict, which was for five thousand dollars (funeral expenses, $606.63; damages, $4,393.37).

When a verdict has been challenged as excessive, the only inquiry which will be made in this court is whether or not it was the result of passion and prejudice. *Sherrill v. Olympic Ice Cream Co.*, 135 Wash. 99, 237 Pac. 14; *Pryor v. Safeway Stores*, 196 Wash. 382, 83 P. (2d) 241, 85 P. (2d) 1045. There is no affirmative showing of passion and prejudice on the part of the jury, and it can not, under the circumstances, be inferred from the amount of the verdict. According to the undisputed testimony, Evelyn was a strong, healthy child, exceptionally intelligent and talented, and the outstanding student of either sex in her high-school class. She was an accomplished musician and dancer, and was already receiving some compensation from younger children as a dancing teacher. She had been rendering substantial assistance to her mother with the household work.

In the case of *Sasse v. Hale Morton Taxi & Auto Co.*, 139 Wash. 359, 246 Pac. 940, a verdict of $3,833.50 for the wrongful death of a girl nearly nine years of age was upheld.

In 48 A. L. R. 817, there is an exhaustive annotation on the subject of excessive or inadequate damages for personal injuries resulting in death. Under subd. XXXIIIb, p. 846, will be found collected numerous cases in which verdicts substantially in excess of the verdict in the case at bar for wrongful death of minor girls were permitted to stand. The verdict will not be disturbed.

The judgment is affirmed.

MAIN, BEALS, MILLARD, and BLAKE, JJ., concur.

STEINERT, J. (dissenting)—The majority opinion begins with a very full and accurate statement of the facts. Toward the end of the opinion, however, the majority draws a conclusion of fact which, ordinarily, would be of no moment, but which, in this case, has quite a bearing on the question of the authority of James Gale and leads to a result with which I do not agree.

No testimony was offered on the question of Gale's agency. The complaint, however, alleged, and the answer admitted, that Mrs. Leuer owned, as her sole and separate property, *a business* "consisting of the sale and distribution of newspapers" over a certain route, and that,

" . . . in the course of conducting her said business of selling and distributing newspapers over the aforesaid newspaper route, the defendant Maiden Leuer did from time to time, and did on the night of December 31, 1938, and morning of January 1, 1939, employ the defendant James Gale *to conduct the delivery* of said newspapers for her." (Italics mine.)

It seems obvious that the pleadings alleged and admitted simply that James Gale was employed to deliver newspapers. The majority, however, concludes that

"Therefore, it may be said that, by the pleadings, it was admitted, in effect, that, during the time in question, appellant Gale was employed by Mrs. Leuer to conduct her newspaper delivery *business* for her." (Italics mine.)

That conclusion, in my opinion, is unwarranted. While delivery of the newspapers undoubtedly constitutes an essential part of "the business of operating a suburban newspaper route," it does not follow that one employed to deliver newspapers thereby becomes the *manager* of the business, with power to employ assistants, incur liabilities, and fasten general obligations on the owner of the business. The fact, as I see it, is simply that James Gale was employed, not in the capacity of a manager *to conduct the business* of Mrs. Leuer, but merely as a newsboy *to deliver the papers.* This phase of the case will be referred to again a little later.

For the present, I shall confine myself to a consideration of what is termed the "benefit" rule, on which the decision in this case is rested. That rule is very clearly stated in 4 Blashfield, Cyclopedia of Automobile Law & Practice (Perm. ed.), 80, § 2292, and is quoted in the majority opinion, as follows:

"One important element in determining whether a person is a guest within the meaning and limitations of such statutes is the identity of the person or persons advantaged by the carriage. If, in its direct operation, it confers a benefit only on the person to whom the ride is given, and no benefits, *other than such as are incidental to hospitality, companionship, or the like,* upon the person extending the invitation, the passenger is a guest within the statutes; but, if his carriage tends to the promotion of mutual interests of both himself and the driver and operates for their common benefit or if it is primarily for the attainment of some objective or purpose of the operator, he is not a guest within the meaning of such enactments." (Italics mine.)

As indicated in the opinion of the majority, the mere rendition of benefits by a passenger is, of itself, insufficient to take one out of the "guest" classification if the benefits are merely "incidental to hospitality, companionship, or the like." In resolving the question of benefits and the direction in which they flow, as well as their character and significance, a factor to be taken into consideration is the intention of the parties in entering upon the undertaking. If their actual and mutual purpose be to enter into a relationship *other* than that of host and guest, and their subsequent acts are not inconsistent with the intended relationship, the mere fact that, in the performance of the undertaking, the one party does nothing more than what a guest normally would do, will not convert the relationship into one of host and guest.

On the other hand, where the intended relationship *is* that of host and guest, the mere fact that benefits have been conferred upon the host will not change his legal status nor that of his guest. Thus, the motives which actuate the parties concerned constitute a primary consideration. Accordingly, when the "benefit" rule is invoked, the transportation must have found its impulse in some mutual understanding from which the carrier has the right to obtain, or expect, some material benefit to himself.

As further stated in the opinion of the majority, "the requirements necessary to *constitute payment for transportation* [the words which I have italicized being those used in the host-guest statute] such as to avoid the bar of the statute" are (1) that there be an actual or potential benefit in a material or business sense resulting, or to result, to the owner, or carrier, and (2) that the transportation be motivated by the expectation of such benefit. This court is now thoroughly committed to the rule which necessitates those

two requirements. *Syverson v. Berg,* 194 Wash. 86, 77 P. (2d) 382; *Fuller v. Tucker,* 4 Wn. (2d) 426, 103 P. (2d) 1086. Even before the enactment of the host-guest statute in 1937, we had in effect declared the same rule. *Dahl v. Moore,* 161 Wash. 503, 297 Pac. 218; *Hart v. Hogan,* 173 Wash. 598, 24 P. (2d) 99.

Under the first requirement above stated, the benefit to the owner or carrier must be one contemplating a "material gain," and not merely a social companionship (*Syverson v. Berg, supra*); it must be "an actual or potential benefit in a material or business sense," and not simply an accommodation rendered from "hospitable, neighborly and friendly motives only." (*Fuller v. Tucker, supra.*)

Under the second requirement, "expectation" of *such* benefit must be the motive prompting the transportation. For the purposes of this case, it is immaterial whether or not we consider the motive of Evelyn, the daughter, upon the particular occasion. Furthermore, whether we consider the motive of James Gale only, or that of Mrs. Scholz only, or whether we consider the motives of both James Gale and Mrs. Scholz, the result is the same, under the evidence, in this case. The proper test, however, in such situations is the intention, or motives, of both parties, whoever they may be, legally involved in the particular undertaking.

The majority opinion recognizes that a mutuality of purpose is required, for, in referring to the manner in which the arrangements for the trip in question were finally made, it is said in the majority opinion that Evelyn's wishes in the matter, or her idea of the purpose of the venture, were of no moment, "the intention and purpose of her mother *and* appellant Gale being the controlling factors." (Italics mine.)

Applying the principles stated above to the facts of the instant case, I am convinced that, from the record,

no other conclusion is deducible than that Evelyn Scholz was a guest of James Gale within the meaning and purview of the host-guest statute.

The record is clear that, so far as Evelyn was concerned, and to the extent of her knowledge upon the subject, her only purpose in accompanying James was for pleasure and social companionship. Evelyn had previously expressed to her mother a desire to attend a dance, or some other New Year's Eve festivity, that night, but Mrs. Scholz had refused to give her consent. In the early part of the evening in question, Evelyn had suggested to her cousin, James Gale, that they attend a show. James, however, indicated that he did not wish to go. Later, during the course of the evening, both James and Evelyn importuned Mrs. Scholz to permit Evelyn to accompany James on the early Sunday morning trip. Mrs. Scholz did not give a definite answer to the request, but said that she "would see" about it. The two young people retired at about eight o'clock, Evelyn then "having hopes of getting to go along."

There is absolutely nothing in the record to indicate that those initial requests were based upon any need by James for assistance. It cannot be denied that Evelyn's desire to take the early morning trip in the automobile was prompted by the same desire for some youthful exhilaration as that which had prompted her requests to be allowed to go to a dance, or to be accompanied to a show. So far as the record reveals, she had no idea that James was to be "compensated" for taking her along. Prior to the time that she retired that night, nothing had been said by either James or Mrs. Scholz to the effect that Evelyn was to render any assistance whatever to James.

Also, it will be noted that, in the conversation be-

tween James and Mrs. Scholz at midnight, while Evelyn was still asleep, the only thing that was said with reference to what Evelyn was to do was that she "*could* help" James by reading the names of the customers on the route book, and thus "save him stopping to get the order of them." That was merely a statement of what she "could" do, not what she was required to do. Furthermore, there is no evidence that even that understanding was communicated to Evelyn. So far as she was concerned, the purpose of the trip had not changed from its original conception.

But even if it could be said, by reason of the conversation between Mrs. Scholz and James Gale at midnight, that Evelyn was supposed to read the names from the route book, that fact, of itself, was not sufficient to clothe Evelyn with the status of a compensating passenger. It was no more than what any guest upon such an occasion would readily have done. If such were not the case, then there could hardly ever be an instance of a "host-guest" relationship. The policy of the legislature in adopting the statute here involved was to do away with litigation arising out of situations such as that involved here. *Shea v. Olson,* 185 Wash. 143, 53 P. (2d) 615, 111 A. L. R. 998.

With reference to Evelyn's assistance by way of holding the papers in her lap and placing some of them in the tubular receptacles along the route, it is to be noted that there was no understanding or agreement, so far as the record shows, that she was *required* to do any of those things; that matter had not even been mentioned by anyone prior to the initiation of the trip. In any event, those acts were wholly gratuitous on her part, and were purely incidental to a venture that was merely one of social companionship.

Moreover, even if it be granted that "the intention and purpose of her mother" was a controlling factor,

it is obvious, from the mother's own testimony, that the help to be rendered by Evelyn was an incidental consideration. Mrs. Scholz was in no way concerned with, or about, James Gale, or his work, when she granted Evelyn permission to accompany him. She was concerned only about Evelyn. She testified directly that, had the weather conditions been adverse, she would not have allowed Evelyn to go along; in other words, had the weather been such as to increase James Gale's need for help, the help would have been denied. Mrs. Scholz frankly admitted that she knew that the suggestion of Evelyn's helping James was simply part of an argument advanced by James to gain her consent. James was desirous of having Evelyn's company. Mrs. Scholz was naturally reluctant to awaken Evelyn at that early hour, or to permit her to be exposed to possible danger. The only real question in Mrs. Scholz' mind was as to the advisability of permitting Evelyn to accompany her cousin on the trip.

Even when interpreted most strongly against appellants, and in the light most favorable to respondents, the record fails to provide substantial evidence in support of the jury's verdict. To hold that the verdict is supported by substantial evidence herein, is, in my opinion, to abandon reason in favor of a tenuous, legalistic argument. From whatever point of view the matter be considered, it seems to me to be incontrovertible that Evelyn accompanied James simply for companionship and enjoyment, and that Mrs. Scholz and James, as well as Evelyn, knew that such was the purpose of the trip.

Furthermore, the authorities from other jurisdictions cited by the majority do not support its conclusion. *Goldberg v. Cook*, 206 Minn. 450, 289 N. W. 512, involved a situation wherein, quoting from the opinion,

"Plaintiff by an arrangement with defendant before they left agreed to go along *for the sole purpose of helping her.* Defendant and her husband importuned plaintiff over a period of several weeks to go along. She refused for the reasons that the trip would serve no purpose of hers, inasmuch as she had been in California twice within recent years, that she preferred to be in her own home, where she lived happily and comfortably with her son and daughter-in-law, and that she could not afford whatever expense might be incident to the trip. The daughter desired her along to help her with the children on the trip, to be with her in Los Angeles, and help her get settled there. She finally agreed to go for the sole purpose of assisting her daughter in the respects mentioned." (Italics mine.)

In *Dorn v. North Olmsted,* 133 Ohio St. 375, 14 N. E. (2d) 11, the plaintiff rode with defendant for the *sole* purpose of pointing out to the latter the place where a certain man lived.

Likewise, in *George v. Stanfield,* 33 Fed. Supp. 486, the plaintiff, at the defendant's request, accompanied the latter to assist him in locating a certain place and a certain man.

*Haney v. Takakura,* 2 Cal. App. (2d) 1, 37 P. (2d) 170, involved a situation wherein the defendant,

"Being aware that Mr. Haney [the plaintiff] was better informed than he on the subject of market conditions, . . . asked the plaintiff to accompany him to Oakland and aid him in securing the best available market in which to sell his oranges. The plaintiff agreed."

Finally, in *Albrecht v. Safeway Stores,* 159 Ore. 331, 80 P. (2d) 62, the plaintiff accompanied his brother-in-law, at the latter's request, on an extended business trip, by automobile, over a mountainous road which was covered with a sheeting of snow and ice. Plaintiff had expressed a disinclination to make the

trip, but finally went because his brother-in-law had insisted that " 'he might need some help, and that his wife didn't want him to make it alone, and he wanted me to go along and help drive.' "

It will be observed that, in each of those cases, from all that appears in the opinions, the passenger accompanied the driver for the sole purpose of conferring some material benefit upon the driver. In other words, each case represents an extreme illustration of an unquestionably proper application of the "benefit" rule. Those cases do no more than to recognize the validity of the rule, the sufficiency of the benefit in each instance being unquestioned. Those cases cannot be considered authority on the crucial question in this case, that is, whether or not any benefit involved was incidental to companionship.

On the other hand, a case which is directly in point is *Audia v. DeAngelis,* 121 Conn. 336, 185 Atl. 78. The actual situation there involved is strikingly similar to that with which we are here concerned. In that case, the plaintiff was a fourteen year old boy, who had been in the habit of accompanying the defendant, a grocer, on delivery trips, in the latter's truck. It was undisputed that the youth at times assisted defendant in making deliveries. The substantial nature of the assistance rendered by the boy was indicated by the fact that defendant would occasionally "pay his [the plaintiff's] way into moving pictures and occasionally gave him some fruit." On the very day of the occurrence there in question, the plaintiff rendered a service to the defendant by going into a store to purchase an item for him. It was there held that:

"The only reasonable conclusion deducible from the evidence was that the rides, and the gifts as well, were given by Guido [the defendant] from hospitable, neighborly and friendly motives only and that the rides were accepted by the plaintiff purely for his

pleasure; . . . The situation depicted by the evidence, *viewed in aspects most favorable to the plaintiff,* lacks . . . 'such definite relations, contractual or otherwise, and . . . such tangible mutual benefits as the statute contemplates in order to remove the plaintiff from the status of a guest and the consequences attaching thereto.' " (Italics mine.)

In like manner, the record in the instant case convinces me that the trip was purely one of social companionship; that it was not within the contemplation of any of the persons concerned that Evelyn was to make "payment for such transportation," by the rendition of services; that the assistance which Evelyn did render was not primarily for the attainment of some objective or purpose of the operator of the car, but was merely incidental to a social venture; that the carriage did not tend to promote any mutual interests, nor was it motivated by any considerations other than social companionship; and that, in consequence, the relationship was one of host and guest.

Leaving that question, I return to the matter suggested in my opening remarks herein. I now desire to call attention to that portion of the majority opinion wherein it is stated flatly that

"Appellant Gale, as acting manager of the paper-route business, had implied authority to take Evelyn with him as a helper."

That statement is predicated upon the fact, as stated above, that it was alleged in the complaint, and admitted by the answer, that James Gale had been employed to "conduct" the delivery of the newspapers. The word "conduct" is then found to be synonymous with "manager," and Gale is accordingly held to have the broad powers of the "manager" of a business.

Even if it be granted that dictionary definitions are of sufficient weight to confer upon one hired to deliver

newspapers the status of a "manager" of a business, it must still be kept in mind that the "broad and liberal implied powers" with which such a "manager" is endowed have a very definite limitation; they must be, in the language of the majority, "incidental, usual, or reasonably necessary in the conduct of the business." There is not a single word in this record which tends in any respect to establish that the use of an assistant was "incidental, usual, or reasonably necessary." There was no emergeny, and there was nothing in the alleged "help" rendered by Evelyn that was different from, or additional to, the very duties which Gale himself had been employed, and agreed, to perform. Respondents, as plaintiffs, of course, had the burden of proof. They not only failed, but they made no attempt, to meet that burden with respect to the point here under discussion. The authority of James Gale, as "manager," or otherwise, to employ, or to take along, an assistant was not established.

Under the holding of the majority opinion, every newsboy, and every operator of a motor truck, making delivery of newspapers or merchandise, may be regarded as a manager to "conduct" the business of his employer, and may engage another, or others, to help him do the very thing which he is employed to do, and for which he is being paid. If, as such "manager," the employee may engage the services of others, necessarily he may obligate his employer to pay for them, for one employed by a "manager" becomes an employee of the principal. And, finally, according to the logic of the majority opinion, the employer will not only become obligated to pay for the services rendered by an "assistant" who has been engaged by the employee, without the employer's knowledge or consent, but also, contrary to the fellow-servant rule, will become liable to the "assistant" for the negligence of

104

the employee in the performance of work in which the employee and the "assistant" are commonly engaged.

I am unable to subscribe to the majority opinion, and therefore dissent.

ROBINSON, C. J., SIMPSON, and JEFFERS, JJ., concur with STEINERT, J.

[1]Reported in 109 P. (2d) 291.