## LLOYD BAXTER McMAHAN v. ODIE L. McMAHAN.
## LLOYD BAXTER McMAHAN v. JOSEPH L. McMAHAN, b/n/f.—276 S. W. (2d) 738.

Eastern Section.  September 17, 1954.

Petition for Certiorari denied by Supreme Court, March 11, 1955.

500

Wynn & Wynn, of Sevierville, and Wayne Parkey, of Knoxville, for plaintiff in error.

Ogle & Ogle, of Sevierville, for defendants in error.

HOWARD, J. These consolidated actions for damages grew out of an automobile accident in which the plaintiffs, Odie L. McMahan and his minor son, Joseph L. McMahan, age 16, sustain personal injuries while riding in an automobile owned and driven by the defendant, Lloyd B. McMahan, a cousin of the plaintiffs. The accident occurred on Highway No. 3, in the town of Creston, Ohio, on the night of August 4, 1953, about 11:15 P. M. The car involved was traveling north on said highway

enroute to the City of Cleveland, Ohio, where the plaintiff, Olie L. McMahan, and the defendant were employed. They were returning to Cleveland from Sevier County, Tennessee, where they had previously visited relatives, and at the time of the accident the plaintiffs were asleep. The highway in the town of Creston curved sharply to the right, and the accident occurred when the defendant was unable to make this curve, losing control of his car which crossed the highway and struck a telephone pole on the west or left side with great force, resulting in the plaintiffs' injuries. According to an agreed stipulation, the highway for several hundred feet south of the curve was straight and was marked by numerous road signs. Beginning about 4/10 of a mile south of the curve there was a sign reading "Speed Limit 35", and spaced between the sign and the curve were 4 other signs, as follows: "Village of Creston Traffic Laws Enforced", "Slow To 20", "Curve Danger 500 Feet", and beyond this, 118 yards from the entrance to the curve, there was an illuminated arrow sign indicating a curve to the right. The highway was 45 feet wide, the weather was clear, and the pavement was dry.

The first counts of the declarations allege in substance that the plaintiffs were riding as passengers in the defendant's automobile when the accident occurred, and that prior to and at the time the defendant was driving his automobile in a wilful, wanton, heedless and unlawful manner, without having said automobile under control, and at a high and dangerous rate of speed of more than 70 miles per hour, in violation of the speed laws of the State of Ohio; that prior to the accident the plaintiffs had agreed with the defendant to bear their proportional part of the automobile expenses of the trip to Tennessee and return, and that the agreement had been complied

with and accepted by the defendant; that the road signs on the east side of the highway were in plain vision of the defendant which he drove by in wilful, wanton and utter disregard of said signs.

The second counts of the declarations allege violation of the following provisions of Section 6307-21 of the 1945 Supplement of the Code of the State of Ohio:

"No person shall operate a motor vehicle, trackless trolley or street car in and upon the streets and highways at a speed greater or less than is reasonable or proper, having due regard to the traffic, surface and width of the street or highway and of any other condition then existing, and no person shall drive any motor vehicle, trackless trolley or street car in and upon any street or highway at a greater speed than will permit him to bring it to a stop within the assured clear distance ahead.

"It shall be prima facie unlawful for the operator of a motor vehicle, trackless trolley or street car to operate the same at a speed not exceeding the following.

\*    \*    \*    \*    \*    \*

"Twenty-five miles per hour in all other portions of a municipal corporation, except on state routes and on through highways outside business districts.

"Thirty-five miles per hour on state routes or through highways within municipalities outside business districts.

"Fifty miles per hour on highways outside of municipal corporations.

"It shall be prima facie unlawful for any person to exceed any of the speed limitations in this or in other sections of this act."

The defendant filed pleas of not guilty and numerous special pleas in which it was denied specifically that plaintiffs were riding as passengers in his car; denied that there was any contract or agreement expressed or implied whereby either the plaintiff or his son were to bear their proportionate part of the expenses of the trip, and denied that such an agreement was ever made or that either of the plaintiffs had ever offered or tendered any compensation to the defendant for said trip, and that none had been accepted by him. He averred that the purpose of the automobile trip to Tennessee was exclusively of a social nature and that instead of plaintiffs being passengers, as alleged, they were riding in his car as guests as defined by Section 6308-6 of the General Code of the State of Ohio, known as the "Guest Statute", which reads as follows:

"The owner, operator, or person responsible for the operation of a motor vehicle shall not be liable for loss or damage arising from injuries to or death of a guest, resulting from the operation of said motor vehicle, while such guest is being transported without payment therefore in or upon said motor vehicle, unless such injuries or death are caused by the wilful or wanton misconduct of such operator, owner or person responsible for the operation of said motor vehicle."

For further plea the defendant denied specifically that he was driving in a wilful, wanton, heedless and unlawful manner, as alleged, or that he was driving 70 miles per hour, or that he did not have his car under proper control. He averred that the accident was due solely to the presence of a very sharp, dangerous and deceptive curve in the highway, and that he did not know of the road signs indicating danger.

At the conclusion of the plaintiffs' proof, the defendant moved generally for a directed verdict, which motion the trial court overruled. The defendant also moved that the plaintiffs be required to elect whether they were proceeding on the theory that they were passengers or were guests, which motion the trial court likewise overruled, the defendant taking exceptions to the trial court's action on both motions. The defendant did not introduce any proof.

The trial resulted in jury verdicts for the plaintiffs for the following amounts: For Odie L. McMahan, $10,000, and for Joseph L. McMahan, $1,000. These verdicts were approved by the trial court and judgment was accordingly entered. Thereafter the defendant's motions for a new trial filed in both cases were overruled, and he has appealed in error to this court, and errors have been assigned which will hereinafter be considered. No question is made here that either of the verdicts was excessive.

Under assignments 1, 7 and 9 the defendant contends that the trial court erred in refusing to sustain his motion for a directed verdict made at the conclusion of the plaintiffs' evidence because there was no evidence on which the cases should have been submitted to the jury. While these assignments involve a review of the evidence, such review is only to determine if there is any material evidence to support the verdicts. In such review we are required to take the strongest legitimate view of all the evidence favorable to the plaintiffs, disregard all inferences to the contrary and indulge all reasonable inferences to uphold the verdicts. Jarratt v. Clinton, 34 Tenn. App. 670, 214 S. W. (2d) 941.

Applying this rule to the instant cases, was there substantial evidence on which the cases should have gone to the jury for the questions of whether (1) the plaintiffs were riding as passengers in the defendant's car, and if so, (2) was the defendant guilty of ordinary negligence in the operation of his automobile at the time of the accident. In disposing of these questions, it is conceded that the decisions of the Ohio Courts are controlling.

The undisputed evidence showed that for several weeks before the accident the plaintiff, Odie L. McMahan, and the defendant worked together as bricklayers for the same concern in the City of Cleveland, Ohio; that they lived at the same street address in Cleveland, and that the plaintiff rode to and from work daily with defendant in his automobile; that about a week prior to the accident, Odie told the defendant he wanted to go to Blount County, Tennessee, to visit his family, and describing the purposes for his trip he testified as follows:

"Q. Who did you come down with from Cleveland, Ohio? A. Lloyd McMahan.

* &ast; &ast; &ast; &ast; &ast;

"Q. Why did you come down here with him? A. I wanted to come and visit my family, and I had one boy going to school and wanted to see about getting some clothes for him and getting him in school.

"Q. Did you want to take your son back with you? A. Yes, I had him a job. He wasn't doing anything.

"Q. What kind of a job did you have? A. He had a job of $180.00 plus taxes out of it.

"Q You had him a job lined up and came down for the purpose of getting him and seeing about clothes for your other son? A. Yes.

"Q. How many do you have in your family? A. Five, 3 children and my wife and myself.

"Q. What is your wife's name? A. Henrietta.

"Q. Where does your wife live? A. She lives in Blount County.

"Q. On whose farm? A. On my daddy's farm.

\* \* \* \* \* \*

"Q. See about any business? A. I have to look after the farm. I am the only child he had.

"Q. And that was another purpose you came down here for? A. Yes."

Describing the plans and the final arrangements made with the defendant for the trip, this plaintiff further testified:

"Q. Now, Odie, you came down here with the defendant, why did you come with the defendant Lloyd Baxter McMahan? A. Well, about a week before we started, I mentioned to Lloyd, \* \* \* I says, 'Lloyd, I have got to go home and visit my family, my mother and father.' So it went on for about a week or so, and Lloyd said, 'Well, when will you be back,' and I said, 'I don't know when I am going but have to go home.' \* \* \* It came up on Thursday before I came home on Friday, and I says, 'I am going home tomorrow', and the superintendent was there behind me and said, 'Are you quitting us?' and I said, 'No, I have to go home.' Well, anyway, Lloyd and I kept talking and when we went in that night, he says, 'I have to go down to Tennessee myself and visit my mother and father', and I asked him—and he says, 'You can go with me.'

"Q. What other statements did he make relative to the trip down here? A. He says, 'I have to carry John McMahan, I have to carry his wife so she can

can some fruit', and I says, 'Being as I have to go on some business * * *'.

"Q. When did this take place? A. Thursday before we left on Friday.

"Q. Did the defendant request you to come with him? A. Yes. He said I could come with him.

"Q. What arrangement did you have about coming down here? A. I asked him, and says, 'How much will you charge me,' and he says, 'I will take you for a round trip train fare.'

\*      \*      \*      \*      \*      \*

"Q. Did you tell the defendant that you were going to bring anyone back with you? A. I said I was going to bring my son back, Joseph.

"Q. What did he say about Joseph coming back with you? A. Said he wouldn't charge me anything for him, and I said, 'That's your car, and it costs money to run it,' and I said, 'I will pay his way.'

"Q. And he agreed to that? A. Yes.

"Q. The same arrangement for train fare back up for him? A. Yes.

"Q. You say he was coming down here for business purposes? A. Yes, business purposes.

\*      \*      \*      \*      \*      \*

"Q. Before you left up there, did you have any other arrangements made about your assisting him in driving or anything else? A. Yes. He wanted me to help drive.

"Q. And that was the understanding you had with Lloyd Baxter McMahan, you would assist in driving? A. Yes.

\*      \*      \*      \*      \*      \*

"Q. When you came down here, did you ever pay

anything to the defendant, Lloyd Baxter McMahan, in compliance with your agreement, did you ever say anything about that when you got down here? A. It was mentioned in the car. Eula McMahan and the little girl gave him a penny, and he said, 'They paid me and he still owes me'. * * *

"Q. What did he say? A. He said you can pay when you get back to Cleveland. We work together.

. "Q. Who heard that conversation? A. My son Joseph."

The undisputed evidence further showed that after the accident both plaintiff, Odie L. McMahan, and his father, Joe L. McMahan, offered to pay the defendant the amounts previously agreed upon for the trip, which the defendant declined to accept. Regarding his offer, the plaintiff, Odie L. McMahan, testified, as follows:

"Q. Did you have any conversation with Lloyd in the hospital? A. It must have been a week or a week and a half, I said 'Lloyd, I still owe you the fare' and he says, 'No, just forget it until you get more able and then you can pay me'.

"Q. You owed him for yourself and the boy too? A. Yes, for myself and the boy too.

"Q. Have you discussed it with him here in Sevier County? A. Up at my daddy's, I offered to pay him and he wouldn't take it.

"Q. What did he say? A. He said I can't take money.

"Q. Did he say why? A. Just said he couldn't take it."

Regarding the defendant's refusal to accept his offer, Joe L. McMahan testified, as follows:

"Q. Joe, I will ask you if you have had any con-

versations with the defendant since you returned home or back to this state? A. Yes, sir.

"Q. Where was the first conversation, where did the first conversation take place? A. Well, we had it there at home. He came there to see the boy.

"Q. Tell the Court and jury what you said to him and what he said to you. A. Well, here is the only thing about it. He rode up there with him and I wanted to pay him, one my boy, and one my grandson, and I said, 'I will pay it myself. They can't pay now', so I wrote out a check to give him to pay their ride bill. That's what I done.

* * * * * *

"Q. What did you do, tell the Court and jury what you did? A. I tried to talk to him and told him to take it, that I didn't want him to ride them for nothing. I said, 'That's too far to ride and the wear and tear of your car'. I said, 'Take it. I am not worrying about it. Here is your money'. I signed a check and offered it to him, and he said, 'I can't take it, it would be agin me'.

"Q. And he refused to take it? A. He refused to take it.

"Q. Did you talk to him on a later occasion? A. Yes.

"Q. What did he say on that occasion? A. He couldn't take it. It would be agin him.

"Q. And you were tendering that money to pay Joe's and Odie's bill up there. A. That's right.

"Q. You were advancing the money for them? A. That's right."

As to the defendant's negligence, the above witness further testified that immediately following the accident

he went to Cleveland, Ohio, at which time he and the defendant drove to the town of Creston, and that while there the defendant gave his version as to how the accident occurred. Relating what the defendant said, this witness further testified:

"Q. First, did he point out to where this wreck occurred? A. Yes, that's right.

"Q. Referring to Exhibit No. 6 to your testimony I will ask you if the defendant pointed out anything in that picture, or any point in that picture where this accident occurred, and if so, where was it? A. It was right here in this curve here.

"Q. In relation to the house in the center of the picture, where did the accident occur? A. It occurred right in the front of that house, but there was a pole setting over there.

"Q. I will ask you if that isn't the pole right there? A. That's right.

"Q. And the defendant told you he hit that pole, is that right? A. Yes.

"Q. And I will ask you if he stated to you how fast he was going when he passed the 'Speed 35' sign before you come into the city limits of Creston, Ohio, how fast did he say? A. Seventy to seventy-five miles.

"Q. How fast did he say he was going when he passed the sign. 'Village of Creston, Ohio Speed Laws Enforced'? A. He was slowed down just before he got to that curve.

"Q. When did he tell you he first started slowing down when he got right at the curve?

*    *    *    *    *    *

"A. He began to slow down when he saw the curve, but it was too late.

"Q. Did he point out to you the sign that caused him to start slowing down? A. Yes, he pointed it out.

"Q. Was it at that sign right there on Exhibit No. 5? A. That's right.

\* \* \* \* \* \*

"Q. How far is that from that curve, is it a short distance or a long distance? A. Short distance.

"Q. How fast did he say he was going when he saw that sign when he started slowing down? A. He said he must have been going faster than seventy.

\* \* \* \* \* \*

"Q. When you were talking to the defendant at Creston, Ohio, did he make any statements as to whether he had been through there before or not? Been through there before? A. I understood him to say he had been through there before. He was talking to me in your presence.

"Q. And he said he had been through there before? A. Yes."

■■ Under the foregoing undisputed evidence, we have concluded that the plaintiffs occupied the status of "passenger" as defined by the decisions of the Ohio Courts rather than as "guests" as insisted on behalf of the defendant. The Ohio rule seems to be well settled that to create the relationship of "host" and "guest" within the guest statute, the privilege of riding afforded the guest must be gratuitous. In Hasbrook v. Wingate, 152 Ohio St. 50, 56, 57, 87 N. E. (2d) 87, 91, 10 A. L. R. (2d) 1342, the court distinguished, in the following language, the term "guest," from the term "passenger," within the meaning of the guest statute:

"The general rule is that if the transportation of a rider confers a benefit only on the person to whom

the ride is given, and no benefit other than such as are incidental to hospitality, good will or the like, on the person furnishing the transportation, the rider is a guest; but if his carriage tends to promote the mutal interest of both himself and driver for their common benefit, thus creating a joint business relationship between the motorist and his rider, or where the rider accompanies the driver at the instance of the latter for the purpose of having the rider render a benefit or service to the driver on a trip which is primarily for the attainment of some objective of the driver, the rider is a passenger and not a guest. 60 C. J. S., Motor Vehicles, § 399 (5), pp. 1012, 1013; Scholz v. Leuer, 7 Wash. 2d 76, 109 P. 2d 294; Peery v. Mershon, 149 Fla. 351, 5 So. 2d 694. See Chaplowe v. Powsner, 119 Conn. 188, 175 A. 470, 95 A. L. R. 1177; Eubanks v. Kielsmeier, 171 Wash. 484, 18 P. 2d 48; Clendenning, Adm'r v. Simerman, 220 Iowa 739, 263 N. W. 248; Liberty Mutual Ins. Co. v. Stitzle, 220 Ind. 180, 41 N. E. 2d 133.

\* \* \* \* \* \*

"Of course, if the owner of a motor vehicle insists upon an arrangement by which a person riding with him is obligated to share the expense of a trip, the provision thus made will preclude the relationship of 'host' and 'guest' notwithstanding the trip may have a social aspect. McMahan v. De Kraay, 70 S. D. 180, 16 N. W. 2d 308.

\* \* \* \* \* \*

"The mere fact that a party riding in an automobile at the invitation of the driver stands in a family relation to the driver does not necessarily

preclude him from being a 'passenger,' yet the evidential effect of the fact of such relationship raises a presumption which precludes the rider from claiming the status of a 'passenger' *unless there is proof of an express arrangement for a passenger status or proof of circumstances which disclose that a 'passenger' status was intended and understood by both parties.* See Finn v. Drtina, 30 Wash. 2d 814, 194 P. (2d) 347, 2 A. L. R. (2d) 919; Hale v. Hale, supra [219 N. C. 191, 13 S. E. 2d 221]; Bradley, Adm'r v. Clarke, 118 Conn. 641, 174 A. 72.'' (Emphasis supplied.)

In Ward v. Barringer, 123 Ohio St. 565, 176 N. E. 217, it was held that the plaintiff who was riding with a mechanic whom he had engaged to repair his stalled car for the purpose of pointing out the location of the car, was not a guest within the meaning of the Ohio guest statute.

In Beer v. Beer, 52 Ohio App. 276, 3 N. E. (2d) 702, the Court held that a sister who had made arrangements with her brother whereby she would pay the expenses if he would transport her to visit their father who was sick in another city, was not a guest but a passenger.

In Duncan v. Hutchinson, 139 Ohio St. 185, 39 N. E. (2d) 140, it was held that it was not necessary that payment for transportation be made in money in order to take the passenger out of the status of a guest, but was sufficient if the passenger by service or assistance to the operator in making the trip compensated the operator or owner in a material or business sense as distinguished from mere social benefit or nominal or incidental contribution to expenses.

In Sprenger v. Braker, 71 Ohio App. 349, 49 N. E. (2d) 958, it was held that the occupant of an automobile injured while on a trip with the defendant to attend a lodge

meeting was a passenger rather than a guest, where it appeared that it was the practice of the lodge to allow compensation at a rate per mile to members using their automobiles to transport other members to meetings, the court saying that no logical distinction could be made between payment by the passenger and payment by someone else in his behalf.

In Fay v. Thrasher, 77 Ohio App. 179, 66 N. E. (2d) 236, the occupant of an automobile was held to be a paid passenger under the Ohio statute as a matter of law, where there was evidence that the defendant was paid regularly for transporting him to and from their common job, there being also some evidence that the parties exchanged services, the court saying it was no consequence whether the plaintiff actually paid compensation or exchanged services with defendant.

In Hartman v. Wooley, Ohio App., 115 N. E. (2d) 714, a comparatively recent case, the court held that the purchase of approximately $2 worth of gas according to a prior agreement and promise to buy the driver several beers did not make the occupant a passenger for hire as a matter of law, but required submission of the question to the jury.

Thus, under the foregoing decisions, we think that the cases were properly submitted to the jury on the question of (1) whether plaintiffs were passengers, and (2) the defendant's negligence, and we find there was ample evidence to support the verdicts on these two questions.

Assignment 2 complains because the trial court admitted in evidence, over the defendant's objections, the following testimony of the plaintiff Odie L. McMahan:

"Q. Did the defendant request you to come with him?

"A. Yes. He said I could come with him.

"Q. What arrangement did you have about coming down here?

"A. I asked him, and says, 'How much will you charge me,' and he says, 'I will take you for a round trip train fare.' "

It is urged that the above testimony did not correspond with the allegations of the declaration that plaintiffs were to "bear their proportionate part of the expense of the trip" and, being a fatal variance, should have been excluded.

While the plaintiffs' declarations do not specifically allege the amounts which they agreed to contribute toward the expenses of the trip, the evidence admitted was not at a substantial variance with the allegations. This plaintiff's explanation as to the amount agreed upon, being the equivalent of "a round trip train fare," only amplified and explained the agreement of the parties, and it was not error to admit in evidence the full details of the agreement. Furthermore, it does not affirmatively appear that the admissibility of this evidence caught the defendant by surprise, or that it was prejudicial to him, or that he was not given full opportunity to deny or refute it. State ex rel. v. Seals, 26 Tenn. App. 333, 171 S. W. (2d) 836. In 71 C. J. S., Pleading, Sec. 535, p. 1104, it says :

"Modern authories hold, and statutes sometimes expressly provide that no variance between the allegation of a pleading and the proof offered to sustain it shall be deemed material if the adverse party is not surprised or misled to his prejudice in maintaining his action or defense on the merits. * * * It may be fatal where the adverse party is misled to

his prejudice, but otherwise it is to be disregarded as immaterial.''

■ Assignment 3, complaining because the trial court permitted the plaintiff Odie L. McMahan to testify that he had an agreement with the defendant to do a part of the driving on the trip, will be overruled because, according to the record, no objection was made to the admissibility of this evidence at the time it was introduced.

■ Assignment 4, complaining because the trial court admitted in evidence over the defendant's objections the testimony of plaintiffs' witness Joe L. McMahan regarding the road signs warning approaching traffic of the curve, will also be overruled, because of the agreed stipulation which recites that ''said signs were in existence at the time this accident occurred and * * * were located as above set out.''

Assignment 5 complains because the trial court admitted in evidence, over objections of the defendant, plaintiffs' exhibits 1 to 6 inclusive. These exhibits were pictures of the road signs previously referred to in assignment 4, and the defendant objected to their admissibility in the absence of a showing that they were erected by the proper state authority. Regarding the erection and control of traffic devices, the Ohio General Code provides as follows:

''4511.10 Placing and maintaining traffic control devices. (GC § 6307-10)

''The department of highways may place and maintain traffic control devices, conforming to its manual and specifications, upon all state highways as are necessary to indicate and to carry out sections 4511.01 to 4511.78, inclusive, and 4511.99 of the Revised Code, or to regulate, warn, or guide traffic.

''No local authority shall place or maintain any

traffic control device upon any highway under the jurisdiction of the department except by permission of the director of highways.

"4511.11 Local traffic control devices. (GC § 6307-11)

"Local authorities in their respective jurisdictions may place and maintain traffic control devices upon highways under their jurisdictions as are necessary to indicate and to carry out sections 4511.01 to 4511.78, inclusive, and 4511.99 of the Revised Code, local traffic ordinances, or to regulate, warn or guide traffic. No village shall place or maintain any traffic control signal upon an extension of the state highway system within such village without first obtaining the permission of the director of highways. The director may revoke such permission and may remove or require to be removed any traffic control signal which has been erected without his permission on an extension of a state highway within a village, or which, if erected under a permit granted by the director, does not conform to the state manual and specifications, or which is not operated in accordance with the terms of the permit. All traffic control devices erected after September 6, 1941, shall conform to the state manual and specifications."

We do not think there is any merit in this assignment, as the signs, a definite warning of the danger, were there. The signs appear from the pictures to be the same character and type of signs as those used generally elsewhere. They were so located as to give warning of the danger of the curve, over which, under the above provisions, the Ohio Department of Highways had exclusive jurisdiction, and, therefore, in the absence of a showing to the con-

trary, it may be presumed that the signs were placed by lawful authority.

Assignment 6 complains because the trial court permitted plaintiffs' witness Joe L. McMahan to testify, over the defendant's objections, that the accident occurred in the village of Creston, Ohio. This assignment will likewise be overruled, as there was other undisputed evidence showing that the accident occurred in this town.

Finally, under assignment 8, the defendant contends that the trial court erred in refusing to sustain his motion, made at the conclusion of the plaintiffs' evidence, to require the plaintiffs to elect as to whether they were proceeding on the theory of being guests or passengers at the time of the accident. In support of this assignment it is argued here, as it was below, that if the plaintiffs were guests the defendant would be liable only in the event the jury found that the defendant was guilty of wilful and wanton negligence, that if the plaintiffs were passengers "the simple rules of negligence were applicable," and that the two theories are inconsistent.

Inasmuch as it was the plaintiffs' theory that they were passengers, no reference having been made in either of the declarations to the Ohio Guest Statute, we find no merit in the defendant's contention. The theory that the plaintiffs were guests was advanced by the defendant as indicated by his special pleas, and the trial court properly charged the jury the law with respect to both theories to which no objection was made. Moreover, no judgment will be set aside in this court for any error in any procedure in the trial of a case unless it shall affirmatively appear that the error complained of affected the results of the trial. Code, Secs, 10653, 10654. There has been no affirmative showing here that the alleged error affected the results of the trial.

It results, for reasons indicated, that all assignments of error will be overruled and the judgment below, in both cases, will be affirmed at defendant's cost.

McAmis, P. J., and Hale, J., concur