[No. 28790. Department One. July 1, 1943.]

J. E. SKEELS, *Respondent*, v. C. F. DAVIDSON et al.,
*Appellants.*[1]

[1]Reported in 139 P. (2d) 301.

*J. Speed Smith* and *Henry Elliott, Jr.,* for appellants.
*Frank Harrington,* for respondent.

ROBINSON, J.—On October 3, 1941, the appellant removed the tonsils of John Earl Skeels, then about six and one-half years of age. The operation was performed at the doctor's office at ten o'clock a. m. The appellant permitted the boy to be taken home at three p. m. He died between one and two o'clock the following morning. This action was brought by his father, and is based upon Rem. Rev. Stat., § 184 [P. C. § 8264].

In this opinion, C. F. Davidson will be referred to as though he were the sole defendant and appellant.

The allegations of negligence were, in substance, as follows: That the defendant did not use care and skill in performing the operation; that he carelessly and negligently permitted the child to return to his home in a weakened condition when he should have remained at the office of the defendant or have been sent to a hospital; that, subsequent to the operation, the child bled profusely, and defendant failed, neglected, and refused to use ordinary care to stop the bleeding; and that defendant failed and neglected either personally to attend the child or, in the alternative, to advise his parents that a nurse should be in attendance.

Plaintiff's counsel opened the case by calling the defendant as a witness. When asked the cause of death, the defendant replied that the child's parents refused to permit an autopsy, and that he could not give a definite answer. When pressed for his opinion, he replied that the child was weak, malnourished, and lacked ability to coordinate; had taken a good deal of water, and "on account of its weakness and its lack of coordination, I think that the child drowned in its own vomitus." The death certificate, a blank form filled out and signed by the defendant, was then produced and submitted in evidence. It reads, in part, as follows:

"Immediate cause of death: Death came with a convulsive seizure 12 hours after tonsillectomy. Due to: Cause not demonstrated. Due to: Child was once treated as thymus case."

When attention was called to the last comment, the defendant at once stated that it was a mistake, and explained that, at the time he filled out the report, he knew that the child had been treated by Dr. Seelye as a "thyroid" case; and that he inadvertently used the word "thymus" instead of "thyroid." It was strongly suggested, during the examination, that the defendant,

realizing that he had been careless in his treatment of the child, designedly made a false and misleading entry in a deliberate effort to cover up and conceal his negligence. Opportunities for referring to this matter were repeatedly created throughout the comparatively long trial, and, although Dr. Seelye was called to prove that he had, in fact, treated the child as a thyroid case, and it was further shown that the so-called "thymic" deaths of children occur while under the anaesthetic and not hours after the operation, it is probable that this early and persistent line of attack was exceedingly damaging to the defense.

Although much of the trial was devoted to an attempt to prove that the operation was unskilfully performed, no substantial evidence to that effect was elicited. The conflict is over the post-operative treatment. The boy's mother testified that he did not seem to bleed very much for the first two hours after the operation, but that the bleeding then increased and continued until three o'clock when the boy was taken home. At that time, according to her testimony, blood was running from his mouth, and, when a tongue depressor was used by the defendant to inspect his throat, it came out covered with blood. She further testified that his teeth were chattering. Blood continued to come freely from the boy's mouth after he was taken home. She became alarmed and called the defendant at about eight-thirty.

"A. The reason I called the doctor was because he had turned ice cold, his whole body, and he had broken out in a cold, clammy sweat. He acted like he was half unconscious. He would act kind of out of his head and like he didn't recognize me all of the time. So I became quite worried about him and called the doctor."

She further testified that the doctor came; that she told him that the boy had been bleeding quite a bit; that he told her there was nothing to worry about; and that he was perfectly all right. He said that he would

call again. He did so, about ten-thirty. He asked if the boy had vomited:

"A. I told him yes, he had vomited quite a quantity of blood. He said, 'How much?' And I said, 'Enough to soak a bath towel under his head.' He said, 'He can bleed a lot more than that, a whole panful, a pint or two pints, but there is nothing wrong.' . . . Q. Was there anything said with reference to any treatment or medicines? A. No. I said, 'I wish his hands weren't so cold,' and he said, 'Well, you would be cold, too, if you had swallowed as much blood as he has swallowed.'"

She testified that the child had vomited about two pints of clotted blood, and that, after the doctor left, he continued getting weaker and weaker. The father, working on night shift, came home about one o'clock. The boy's pulse was getting weaker, and his lips were turning blue. She asked him to call the defendant.

The father testified that the boy was bleeding considerably when he was taken from the doctor's office, and that, when he came home from his work, he seemed pretty far gone. He called the doctor and told him his boy was dying. The doctor told him to take him to Columbus hospital at once. When they arrived at the hospital, a nurse and interne attempted to revive the boy, but without success. Nor was the defendant able to do so when he arrived shortly thereafter.

Mrs. Orban, a neighbor, was at the house when the boy was brought home, returned there before the defendant's first evening visit, and remained for some hours. Her testimony as to the boy's condition, the quantities of blood, and as to what the doctor said and did, agrees perfectly—in fact, rather too perfectly—with that of Mrs. Skeels.

Dr. Davidson denied that the child was bleeding when he was taken from the office, and his office nurse testified to the same effect. He stated that, on his first visit to the Skeels' home, the child was cold and clammy, as a child is when nauseated and vomiting,

but, when he returned on his second visit, his color had changed to pink, and his skin was warm and moist. He denied that anything was said to him about an unusual amount of blood, or that he saw any unusual amount at any time. In the course of his examination, he detailed the very extensive pre-operative tests. These ranged through syphilis, glucose tolerance, urinalysis, blood count, coagulation, and metabolism. He, of course, testified that he used no styptics or coagulative agents after the operation, since he at all times maintained that no unusual or abnormal bleeding occurred.

The boy was quite subnormal, both physically and mentally. His speech was so retarded that, although he was past six years of age, it was very difficult for strangers to understand him. Dr. Stevenson Smith, of the department of psychology of the University of Washington for the past thirty years, and whose competence in his field is universally recognized, testified that he gave him the Stanford-Binet test and personally observed him for a period of two hours when he was at the age of four years and seven months. The test fixed his mental age at two years and two months. Although his speech was a little better than that of a normal child of that age, he showed unusual lack of coordination, and he represented at that time "a feeble-minded level." He tested him again at the age of five years and seven months, approximately one year before the boy's death. At that time, he showed, under the Stanford-Binet test, a mental age of two years and ten months. This test indicated no relative improvement, but again displayed "a typical picture of feeble-mindedness." He was also tested by the Merrill-Palmer scale, in which test he also showed a mental age of two years and ten months. He was also given the so-called "good enough" tests in which the child is requested to draw certain simple pictures. In these tests, he showed the capacity of a child of but eighteen

months. Dr. Smith's conclusion was that the boy presented, not a mere case of retarded development, but one of permanent mental deficiency, but repeatedly stated that his conclusion should not be regarded as infallible, saying, among other things: "I do want to stress that a diagnosis along these lines cannot be made with absolute certainty."

The boy had attended the speech clinic at the University of Washington for three or four days a week for a period of six or seven months, ending in August before his death. An instructor testified that, while there, it was difficult to keep his attention, and his retention was very poor. He showed but little progress, and, on the advice of the clinic, he was taken to defendant Davidson who, after a long experience in surgery, had, in 1925, spent five months in the East and nine months in Europe studying problems of nutrition, growth, and development. According to his mother, when he was taken to Dr. Davidson, he was in good general health, although somewhat underweight. He had had a serious case of tonsilitis the previous July. Dr. Davidson testified that he was undernourished, had a distinct lack of muscle tone, and was extremely deficient in the matter of coordination. He undertook to study the case, and, as preliminary to adopting a course of treatment, advised his parents that, if his tonsils were removed, it might possibly contribute to the building up of his weight and general health; hence, the operation.

However, there is, to a limited extent, another side to this dark picture. About two years before the boy's death, he was examined at the Children's Orthopedic Hospital by Dr. Douglass who, while recording that "he does not respond to questions, does not talk plainly," described him as "a well-nourished, normal-appearing boy." There are also photographs of the boy in the record which were taken on his fifth birthday. These, of course, do not show any mental defi-

ciencies, nor are any physical deficiencies indicated. In fact, in these photographs, which, of course, went to the jury room, he has the appearance of an outstandingly attractive boy of whom any parent would be justly proud.

We have felt it necessary, in spite of the requirements of brevity, to make the foregoing rather extended statement of the evidence, because of the general importance of the second question raised on this appeal. But, before dealing with that question, we will dispose of the first which appellant states, as follows:

"Is there any evidence to show that the death resulted from any act or omission of the appellant?"

The chief argument under this head is implicit in the inquiry: How could the jury be permitted to say that the defendant wrongfully caused the death of the boy when the cause of his death was not shown?

Doubtless, in many cases, only a medical man may speak with authority as to the exact cause of death, or, to put the matter in another way, to say what caused the heart to stop, but every layman knows that it can be caused by excessive loss of blood. We think, putting it baldly, that, under the testimony in this case, a jury of laymen could find that the boy bled to death. We fully realize that the amount of blood lost was probably greatly over-estimated by the witnesses. The two pints which he is said to have vomited during the course of the evening was very likely largely water. The estimate of quantity from the bloodiness on the bed clothing was also very likely excessive, for a very little blood will make an extensive stain. But we, of course, have no right whatever to weigh the evidence. The jury had a right to believe that the boy bled freely from two p. m. on, and that, during the evening hours, he threw up a quart, or, as it was stated by the witness, two pints, of clotted blood.

The only alternative cause was suggested by the defendant. After stating that the child was weak, mal-

nourished, and lacked ability to coordinate, he said: "On account of its weakness and its lack of coordination, I think that the child drowned in its own vomitus." Quite obviously, his original weakness was well-known to the appellant and would be greatly accentuated by the loss of large quantities of blood. Furthermore, it does not appear that any exception was taken to instruction No. 7, which, therefore, became the law of the case. It read, in part, as follows:

". . . Therefore, although you find the defendant to have been a competent diagnostician, yet if you find that he neglected to give the plaintiff's deceased [son] proper care and attention subsequent to the operation, which in his case was required, and that as a result thereof the plaintiff's son died, then the plaintiff is entitled to recover regardless of the question of defendant C. F. Davidson's skill or lack of skill."

Under the evidence, as hereinabove stated, and which the jury had a right to believe, we think the jury would have been warranted by this instruction in finding a verdict against the defendant, even though it accepted the cause of death suggested by the appellant. It will be remembered that it was alleged that the defendant failed to advise the parents that the child should have constant, expert supervision, such as would be given in a hospital or would be afforded by a nurse.

As preliminary to a discussion of the second question raised by the appeal, we quote instruction No. 11:

"You are further instructed that should you decide from the evidence that the plaintiff is entitled to damages for the loss of his minor child, you will give consideration to the following as a measure of damages to be awarded.

"*You shall determine the value of the services of this child from the date of the injury until he would have attained the age of majority, less the cost of his support and maintenance to his parents during this interval.*

"In determining the value of the deceased child's services, you must take into consideration the child's

health, his mental and physical capacity, both present and prospective, as well as the situation of his parents.

*"In determining the value of the deceased child's services, you should not consider any distress, sorrow or mental suffering of the parents caused by the death of said child.*

"You may also consider what expenses may have been incurred, as shown by the evidence, by the plaintiff for funeral expenses as the result of the death of the child." (Italics ours.)

The jury returned a verdict for the plaintiff in the sum of $1,125. As the funeral expenses amounted to but $125, it follows that the jury must have found that the boy would have rendered services to his parents, by the time he reached the age of twenty-one, of the value of one thousand dollars, in excess of his cost and maintenance. In substance, the second question propounded is this: Whatever the rule may be as to a normal child, how can any jury be permitted to find, under this instruction, which correctly states the existing law, that this child would have rendered services during his minority of a value in excess of the cost of his support and maintenance? The cost of his maintenance, even up to the time of his very death, must have been great. Among other things, it incidentally appears that he had been under the care of one private physician alone for a period of two years. It is argued, and with good reason, that, by any conceivable pecuniary standard, the child was definitely shown to be a liability, and it is stressed that the jury was correctly instructed that it could not consider the distress, sorrow, or mental suffering of its parents.

There is, perhaps, no other phase of the law of damages which is in so unsatisfactory a state as that concerned with the rule governing damages for the wrongful death of a child, under a statute such as our own which creates the right of action, but prescribes no measure of recovery. The pertinent portion of our statute (Rem. Rev. Stat., § 184) reads as follows:

"A father, or in case of his death or desertion of his family, the mother may maintain an action as plaintiff for the injury or death of a minor child, . . ."

The statute has so read since 1869, with this exception: The word "minor" was inserted in 1927 (Laws of 1927, chapter 191, p. 241, § 1). Similar statutes exist in England and in all of our states. In the majority, as in our own, the measure of damages, to be employed in granting relief, is left wholly to the courts to prescribe. In its first serious consideration of the matter in the early case of *Hedrick v. Ilwaco R. & N. Co.,* 4 Wash. 400, 30 Pac. 714, this court pointed out that, although at common law a parent could not recover for the wrongful death of a child, he could maintain an action for the loss of services of his minor child from the time of the injury to his death, and, speaking of the statute with which we are here concerned, it said:

"The object of the statute is to create a new and independent right of action for the loss of services subsequent to the decease of the child, which did not exist at common law."

Accordingly, the court quite naturally arrived at the following conclusion:

"The measure of damages in such cases is the value of the child's services from the time of the injury until he would have attained the age of majority, taken in connection with his prospects in life, less the cost of his support and maintenance."

This court and the majority of state courts—for this interpretation has been quite general—have attempted to apply this rule ever since. This court, like others, has long realized that the rule is not satisfactory, and, in many cases, wholly impractical. As early as 1894, the court recognized its deficiencies in an opinion written by Judge Dunbar in *Atrops v. Costello,* 8 Wash. 149, 35 Pac. 620. In 1926, after quoting the rule of the *Hedrick* case, in *Skidmore v. Seattle,* 138 Wash. 340, 244 Pac. 545, the court said:

"While this is a sound theoretical measure, it is, of course, one which is impossible of application with any degree of exactness in the vast majority of cases; but this measure of loss for the death of a minor is the only theoretical measure that can be adopted, having in mind that it is the actual pecuniary loss to the father that is the measure of his right of recovery. So, we must apply such measure as best we can, and upon that theory approximate the father's actual loss."

And so the court, in the instant case, was justified in instructing the jury as has been invariably done in previous similar cases:

"You shall determine the value of the services of this child from the date of the injury until he would have attained the age of majority, less the cost of his support and maintenance to his parents during this interval."

It is a matter of common knowledge that, previous to the present war at least, such a computation as the jury was directed to make would result in no damages, except in the cases of a few gifted children employed in the entertainment field. In dealing with the subject, McCormick, in his recent work on Damages, says, on page 353:

"According to the estimate of certain distinguished actuaries, the cost of raising a child to age 18, in an average family, is $7,425."

The computation was made with respect to a family whose head earns, in his most productive period, twenty-five hundred dollars per annum, and the details are shown in a footnote. It is taken from Dublin and Lotka, "The Money Value of a Man," p. 37 (The Ronald Press, N. Y. 1930). See, also, William F. Ogburn, "The Financial Cost of Rearing a Child: Standards of Child Welfare," U. S. Children's Bureau, Publication No. 60, 1919.

In *Atkeson v. Jackson Estate*, 72 Wash. 233, 130 Pac. 102, the court sustained a recovery of one thousand dollars with respect to the death of a little girl who was

but two years and two months old. The opinion closes with these words:

"The evidence tended to show that the child in the case at bar when she met her death was of sound health and vigorous body and as well developed mentally as the ordinary child of her age. We think, therefore, that the parents were entitled to recover substantial damages for her loss, and that the trial court did not err in its award."

It is pointed out by the appellant, and correctly, that this reasoning wholly fails in the instant case, but there was another reason stated, though not fully developed in the opinion. In speaking of the decisions of other states, the author of the opinion said:

". . . in principle they hold that it is the purpose and intent of the statutes to provide for the award to the parents of substantial damages in all cases where the death of their child is caused by the negligence of another."

This broad generalization was not new in our case law. Substantially, the same statement was made in the opinion in *Atrops v. Costello, supra,* decided in 1894. It is clearly made one of the grounds of decision in the opinion in *Sweeten v. Pacific Power & Light Co.,* 88 Wash. 679, 153 Pac. 1054. In sustaining an award of $2,593, with respect to the death of an eight year old boy, Judge Ellis, speaking for the court, said:

"The claim that there was a fatal lack of proof, in that there was no evidence as to the probable value of the services of the child had he lived to his majority, is without merit. In such a case it is within the province of the jury, knowing the age, health and capacity of the child and the situation of the parent, to form an estimate of the pecuniary loss to the parent, present or prospective, resulting from the death of the child, and thereon award substantial damages. *Atrops v. Costello,* 8 Wash. 149, 35 Pac. 620; *Atkeson v. Jackson Estate,* 72 Wash. 233, 130 Pac. 102. In the nature of the case, direct evidence of specific pecuniary loss would be impracticable, not to say impossible. *To hold that, without such direct evidence, no recovery beyond*

*nominal damages could be had, would render nugatory the statute permitting a recovery for wrongful death, Rem. & Bal. Code, § 184 (P. C. 81 § 17.), as applied to the loss of a child of tender years. Ihl v. Forty-Second St. Etc. R. Co.,* 47 N. Y. 317, 7 Am. Rep. 450." (Italics ours.)

In *Kranzusch v. Trustee Co.,* 93 Wash. 629, 161 Pac. 492, the court sustained a verdict of $3,576, in the case of the death of a four year old boy. Some evidence, the amount and nature of which is not revealed by the opinion, was admitted concerning the earning power of boys during their minority. No evidence was admitted concerning the cost of rearing a boy. There was, therefore, no basis whatever for actual computation. It was argued that no recovery whatever could be had under these circumstances, and that, in any event, the recovery was too large. The court said, among other things:

"Finally, it is urged that the verdict is not justified by the evidence, being too large. *But the jury were entitled to return substantial damages. Sweeten v. Pacific Power & Light Co.,* 88 Wash. 679, 153 Pac. 1054. From the nature of the case, the amount of the damages could not be specifically proven. All the jury could do was to take into consideration the age, health and capacity of the child, the situation of the parents, and award such damages as to them should seem just. *Actions of this kind are specially permitted by statute; Rem. 1915 Code, § 184; and the verdict should not be interfered with unless it appears affirmatively that it was the result of passion or prejudice, or so grossly exceeds a just award that this result must be presumed. No such condition appears here."* (Italics ours.)

It is abundantly clear, from our own decisions and from hundreds of others of other jurisdictions, that the recognized measure of damages in this type of case is, as said in the *Skidmore* case, *supra,* "impossible of application with any degree of exactness in the vast majority of cases." In the hope of finding a more exact

measure, we have made a comprehensive survey of the authorities. The encyclopedias, textbooks on torts and damages, the legal periodicals, and the case law of England and of our sister states have all been thoroughly examined. Since this opinion is already over-long, in stating the results of this examination, we must confine ourselves to a few comments and a brief citation of the general authorities.

The majority of the courts, in those states having statutes like, or equivalent to, our own, employ the same measure of damages which was given to the jury in instruction No. 11. The majority also hold, as this court has several times held, and with especial definiteness in *Sweeten v. Pacific Power & Light Co.*, 88 Wash. 679, 153 Pac. 1054, that a recovery beyond nominal damages may be had even though there is no evidence as to the earning power of the particular child, or as to the cost of his support and maintenance, or as to the earnings or cost of maintenance of children generally. The theory of such cases is that it is the intent of such statutes that there shall be some substantial recovery in any case where it is found that the child's death was caused by the negligence of the defendant.

A few courts apply the measure of damages under discussion quite strictly, but the majority have, in practice, liberalized its application in various ways and by various devices. Some decisions go to extreme lengths in an attempt outwardly to comply with it. For example, it has been held that a jury may find that a boy, two and one-half years of age, is capable of rendering services of a monetary value. *Reid v. Moyd*, 186 Ga. 578, 198 S. E. 703. And the appellate court of one state has held that, although the jury must be instructed that the measure of damages is the value of the services of the child until he would have attained the age of majority, less the cost of his support and maintenance, it may, in computing that amount, consider its love and affection as having pecuniary value.

See McCormick on Damages 352, § 101; 2 Cooley on Torts (4th ed.) 150, § 219; Prosser on Torts, pp. 961 to 967, § 103; Elements of Compensation For The Death of a Minor Child, (1932) 16 Minn. L. Rev. 409; Measure of Damages in Case of Death of Minor Child, (1927) 13 Va. L. Rev. 392; note, 41 L. R. A. (N.S.) 795, Right of court to hold as a matter of law that a child of tender years is incapable of rendering valuable services.

No recovery for wrongful death was allowed at common law. Following the passage by the English Parliament of Lord Campbell's Act in 1846, similar legislation was passed in all jurisdictions whose legal systems are based on the common law of England, including all of the United States. There was, however, a widespread fear that, unless some limitations were imposed, oversympathetic jurors would return unreasonable and excessive verdicts. Various preventive means were employed. In numerous statutes, maximum limits on the recovery were provided. It is said that, where this was not done, the courts, quite generally, attempted to forestall exorbitant verdicts by making extremely narrow interpretations of the wrongful death statutes. Some text writers and judges so account for the origin of the measure of damages under discussion. This may well be doubted. As has been pointed out earlier in this opinion, the interpretation of our statute made in the case of *Hedrick v. Ilwaco R. & N. Co.*, 4 Wash. 400, 30 Pac. 714, is logical and natural.

It is said in IV Restatement, Torts, 638, § 925:

"The measure of damages for causing the death of another depends upon the interpretation of the statute which creates the right of action."

The interpretation of the statute creating the right of action of the respondent in this case, as made in the *Hedrick* case over fifty years ago, has ever since been recognized as valid, and, although the rule of damages therein declared has been somewhat liberalized under the stress of necessity, that interpretation is still bind-

ing upon us. Furthermore, in spite of the seeming absurdity of instructing juries to make a computation which, in many cases, it is wholly impossible for them to make, an extensive research has not revealed a satisfactory substitute.

The chief practical objection to the measure of damages under discussion is the fear that, since it can rarely be applied with anything like certainty, it is likely to promote excessive verdicts. This difficulty is inherent in the matter, as in many other phases of the law of damages, such as, for example, where damages for pain, mental suffering, alienated affections, etc., must be assessed. In such cases, no exact standard of measurement can be prescribed. The measure of damages under discussion serves, at least, to impress upon juries that the law does not intend or contemplate the impossible thing of completely compensating a parent for the loss of a dearly beloved child. Furthermore, in some cases where the child is in his teens, the measure can be fairly literally applied. See *Skidmore v. Seattle, supra,* and, if, on occasions, a jury returns an unreasonably excessive verdict, there is a remedy in the right of the trial court to grant a new trial, unless a portion of the verdict is remitted.

Appellant contends that, under the facts of this case, the plaintiff was entitled to nominal damages only. As we have seen, this court has long been committed to the majority rule that a jury may allow the plaintiff parent substantial, as distinguished from nominal, damages, upon the bare finding that his child's death was caused by another's negligence. Some part of the verdict, in addition to that portion relating to funeral expenses, must, therefore, stand, and all of it must stand, unless the one thousand dollars which it awards with respect to the death of the child is to be held excessive. But before the trial court can interfere with a verdict of a jury as being excessive (at least, a verdict returned in a case brought under § 184 of the

code, as this case is), passion and prejudice must be affirmatively shown, or it must appear that the verdict so grossly exceeds a just award that passion and prejudice must be presumed. *Kranzusch v. Trustee Co.*, 93 Wash. 629, 161 Pac. 492. See, also, *Scholz v. Leuer*, 7 Wn. (2d) 76, 92, 109 P. (2d) 294. In our opinion, an award of one thousand dollars in the instant case does not warrant such a presumption.

█ The judgment entered on the verdict is susceptible of a construction granting a recovery against Mrs. Davidson, individually. We assume, however, that this was not the intention of the trial court, and that the inadvertence could have been corrected without the taking of an appeal. Accordingly, the modification herein made will not affect the taxation of costs.

The judgment appealed from, in so far as it runs against C. F. Davidson and the community consisting of C. F. Davidson and wife, is affirmed.

MILLARD, STEINERT, and JEFFERS, JJ., concur.

