[No. 32563. Department Two. March 1, 1954.]

RAYMOND ORME, *a Minor, by Norma Orme, his Guardian ad Litem, Respondent,* v. LILLIE MAE WATKINS *et al., Appellants.*[1]

[1]Reported in 267 P. (2d) 681.

*N. A. Pearson,* for appellants.

*Bassett, Geisness & Vance,* for respondent.

SCHWELLENBACH, J.—This is an appeal from a judgment for injuries sustained by a six-year-old school boy when he was hit by an automobile driven by Mrs. Watkins.

The accident occurred about eleven a. m., April 18, 1952, at the intersection of Twenty-third avenue south and Atlantic street, in Seattle. The day was bright and clear, and the streets were dry. Twenty-third avenue south runs northerly and southerly, and Atlantic street runs easterly and westerly. In the center of the intersection there was an overhead traffic control signal containing three lights. At the top was a red "STOP" light. Underneath that was an amber "CAUTION" light, and underneath that was a green "GO" light. These lights are so controlled that the signal switches directly from red ("STOP") to green ("GO"). It then switches from green to amber ("CAUTION") before it switches to red.

The accident occurred at the crosswalk on the southwest corner of the intersection. The boy had come out of the

M & M Food Store and was waiting at the curb to cross over to the Colman School. Apparently the school bell had rung designating the close of the recess period. Mrs. Watkins drove south through the intersection and was at the south crosswalk when the boy stepped off the curb and the collision occurred. After the collision, the boy was lying in the street about two or three feet from the curb and about twelve feet south of the south line of the crosswalk. There were skid marks for a distance of about forty-two feet from the point of impact.

As usual, there was a discrepancy in the testimony as to how the accident occurred. Vernon L. Hunkins, a truck driver, testified that he was traveling north on Twenty-third avenue south; that, when he was about a block away, he saw Raymond Orme and another boy standing at the curb. He testified, "As far as those two boys were concerned, there wasn't a car within a thousand miles. Their eyes were glued to that light in the intersection." He testified that he saw Mrs. Watkins driving in the opposite direction; that the light had turned amber at least fifty feet before she reached the intersection; that she slowed down, and then proceeded on through; that the light turned green in the boy's favor before he left the curb. Mr. Hunkins did not see the actual impact because Mrs. Watkins' car was between him and the boy when the collision occurred.

Mrs. Watkins testified that as she approached the intersection the traffic light was red; that she stopped for about a quarter of a minute; that the light turned green; that she saw the boy come out of the store and stop at the crossing; that when she got close to him she heard a "bump"; that she slammed on her brakes and went back to where the boy was lying; that she was traveling about ten or fifteen miles an hour. James F. Shannon, the principal of the Colman School, talked to her before the officers arrived. He testified that she told him, "I wasn't doing over thirty miles an hour"; that later he heard her tell the officers that she was going twenty miles an hour. This was denied by Mrs. Watkins. Under cross-examination, she testified that she

had traveled over this intersection every day for four months; that she knew that there was a school there; that she first observed the boy standing on the sidewalk when she was a block away; that she did not sound her horn as she went through the intersection. Her testimony was corroborated by Louise Bessant, who was riding with her.

The complaint alleged that defendant wife drove at a negligent and unlawful speed of more than twenty-five miles an hour and negligently, without sounding her horn, and without yielding the right of way to the boy, drove into him, inflicting injuries to him, to his damage, in the sum of $7,500. Defendants answered, denying negligence and denying damage in any amount. Evidently, the jury believed the testimony of Mr. Hunkins, a disinterested witness, as to what actually occurred, and did not believe appellant wife and the lady who was riding with her. It found for the plaintiff and awarded damages in the sum of $5,000. This appeal follows.

Appellants urge that the trial court erred in denying defendants' challenge to the sufficiency of the evidence; in giving certain instructions; in refusing to give a requested instruction; in denying motion for judgment n.o.v. or in the alternative for a new trial; in not reducing the amount of the verdict; and in entering judgment for the plaintiff.

The legislature had a motive when it provided for an amber light as a part of a traffic control signal. The amber light is not an invitation to try to beat the red light. It is a warning that shortly the light will turn red, and anyone who proceeds into an intersection under such circumstances does so with the knowledge that the light might turn red (and green for persons about to traverse his path) before he can complete his trip through the intersection. We are satisfied, from the facts heretofore related, that the plaintiff presented a *prima facie* case, and that the trial court did not err in denying the challenge to the sufficiency of the evidence. The jury having found for the plaintiff on disputed testimony, it was not error to deny the motion for judgment n.o.v.

■ The trial court gave instruction No. 6:

"I instruct you that a statute of this State provides that every motor vehicle shall be equipped with a suitable horn, which shall be sounded at any time when such vehicle is approaching a condition of danger or where, in the exercise of due care, warning should be made or given. If the driver of an automobile fails to exercise reasonable care in observing the requirements of this statute, such failure is negligence as a matter of law for which he is liable in damages to any person injured as a natural and proximate result thereof."

Had the testimony been undisputed that Mrs. Watkins stopped with the red light and proceeded across with the green light, as she claimed, the above instruction would not have been proper. However, there was testimony that she knew the school was there; that she saw the boy on the sidewalk when she was a block away; that the light turned amber when she was fifty feet from the intersection; that she hesitated and then proceeded into the intersection with the amber light on. We feel that under testimony such as this, the instruction was proper.

■ The court gave instructions Nos. 7 and 8:

"I instruct you that a pedestrian has the right to enter a street intersection when the green light turns in his favor and to proceed across it and to presume that traffic from his left and right will be carried on in obedience to the law and not interfere with his progress."

"If you find from a preponderance of the evidence that the plaintiff Raymond Orme left the sidewalk when or after the traffic control light facing him turned green, you are instructed that he had the right of way over the vehicle operated by defendant Lillie Mae Watkins, and under such circumstances her failure to yield the right of way is negligence."

Contributory negligence was not pleaded because of the boy's age. It was not before the jury. The instructions complained of were therefore proper. See *Lubliner v. Ruge,* 21 Wn. (2d) 881, 153 P. (2d) 694.

■ Error is assigned in the refusal of the trial court to give the following requested instruction:

"I charge you that if you believe after full consideration

of all the facts and circumstances surrounding this case that what happened was a mere accident which was under all circumstances unavoidable, then there can be no recovery in the action and your verdict should be for the defendants."

In the recent case of *Cantrill v. American Mail Line, Ltd.*, 42 Wn. (2d) 590, 257 P. (2d) 179, we said this, with reference to the use of the term "mere accident," in instructions:

"We think the use of the words 'mere fact' in No. 2 (not excepted to) and in No. 3, and of the words 'mere accident' in No. 11, tends to belittle appellant's position in the case in the eyes of the jury. We, therefore, deem it proper to suggest that the word 'mere' be omitted from these or similar instructions upon a retrial of this case in order to avoid any question as to the impartiality of the instructions as a whole."

Of course, the *Cantrill* decision was filed May 8, 1953, while the case at bar was tried March 24, 1953. The *Cantrill* case indicated that, if facts are presented which bear on the issue of unavoidable accident, an instruction on that issue is proper. In the instant case, the court gave instruction No. 10:

"The court instructs the jury that if you find from the evidence in this case that the defendant driver drove through the intersection with the green light and on her own side of the highway, and in the exercise of due care, and the plaintiff boy stepped off the sidewalk and ran into the side of defendant's automobile, then I charge you that he cannot recover and your verdict must be for the defendants."

That instruction clearly presented the appellant's theory of the case to the jury. To have given, in addition, an instruction on unavoidable accident, would have been surplusage and might have tended to confuse the jury. After all, the question confronting the jury was one of negligence. If Mrs. Watkins was guilty of negligence which was the proximate cause of the boy's injuries, she was liable in damages. If she was not guilty of such negligence, she was not liable in damages.

Error is assigned in giving instruction No. 13:

"If you find a verdict for the plaintiff, you will assess his damages in such an amount as will fully and fairly com-

pensate him for such injury to his left arm and hip, right leg and knee, forehead, face and mouth, and for such impairment of his physical vitality, if any, as he has sustained as a result of his injury, and also for such pain, if any, as he has suffered in the past or is reasonably certain to suffer in the future, as a result of his injury. In assessing the compensation to be paid, if any, for future pain and suffering or for impairment of physical vitality, I instruct you that you cannot indulge in speculation or uncertainties, but may award damages only for such matters as are reasonably certain to happen as disclosed by the evidence. ·

"The law has not furnished us with any fixed standard by which to measure pain and suffering or the impairment of one's physical vitality, nor by which to measure the compensation to be paid for such things. With reference to these matters you must be guided by your own experience and judgment, based upon the evidence in the case.

"The purpose of the law is not to punish the defendant but to fairly and fully compensate the plaintiff. Under no circumstances shall your verdict exceed the sum of $7,500.00."

■ Appellant contends that there is not a syllable of evidence of permanent disability, or of any impairment of physical vitality, or of future pain and suffering.

The boy's mother testified that when she arrived at the scene, Raymond was lying on the curb on his side. She testified:

"Q. Did you observe his condition? A. Well, he was dazed; he didn't even know me. He was crying—well, he was, you know, whining more—and he didn't recognize me or anything at the time. Q. Was he bleeding at all? A. From his mouth."

The boy was taken to Harborview Hospital, but was released the same day. He missed two or three weeks from school. The mother further testified:

"Q. (By Mr. Bassett) What effect did this injury have on his sleep? A. Well, he was very restless and called me and woke me up in the night times. I gave him aspirins to soothe him. Q. Had he been restless like that and wakened during the night before the accident? A. No, he hadn't. Q. Did you observe anything else about his habits following the accident? A. Well, he started wetting his bed, which was an

embarrassing situation to him. He was quite a big boy. Q. And he hadn't done that before? A. No. . . .

"Q. What was the condition of his face? Will you describe it for the jury—three or four days after the injury? A. After? A. Yes. A. Well, I think it was Monday, his whole face swelled up; he had two black eyes, and his nose swelled up. I thought he had a broken nose; his nose was so full it worried me. I thought he had a broken nose. Q. What was his worst complaint following this injury, Mrs. Orme? A. Well, I think it was his knee bothering him, and his headaches, at the most. Q. And how long did those headaches continue? A. Well, he still complains of them occasionally. Q. And were his complaints more often during the months that followed the accident? A. Yes. Q. Does he complain now about his knee at any time? A. Well, still occasionally, like if he had been walking, out walking a great deal."

The boy's father testified:

"Q. Will you give the jury some idea how his face looked some three or four days after the injury? A. Well, his forehead and eyes and his nose all kept swelling, and he kept swelling between his eyes, and his forehead was cut and his face and lip were cut, and he had cut his cheek pretty near through the inside of his cheek, from a tooth. Q. How long did he continue that appearance? A. Oh, I would say five or six weeks. Q. Before it all cleared up? A. Yes. There was an awful discoloration. Q. How long was he confined to the home? A. Well, he was kept in bed for the first week, and after—or two weeks, I guess, before he went back to school the third week I think it was. Q. What were his complaints? A. Well, he had an awful headache, and his arm ached him awful and it was all swelled up. Q. His arm? A. Yes, and the elbow, the forearm, and then of course his hip and leg; but his main complaint was his knee, his right knee. Q. Did you observe any nervousness about him following the injury? A. Well, he had an awful time sleeping, you know, quite a bit; and then wetting the bed, something he hadn't done since he was real small. Then later on he got so he couldn't stay awake in school. It sort of made him awful sleepy; he wanted to sleep all the time. Q. What are his complaints today, almost a year following the accident? A. Well, every once in a while he has a headache, complains of headaches a lot. Then if he is running and playing his leg seems to bother him."

Dr. James H. Berge examined the boy November 15, 1952, at the request of the defense. He examined him thoroughly. He testified:

"Examination showed him to be a well-nourished well-developed little boy of seven years of age. He appeared to be perfectly normal in talking to me and in handling himself about the office as would any other child of his age. He was very cooperative and easy to examine. He was examined chiefly as to injury to his brain.

"There was no paralysis or paresis—paresis is weakness, as compared to paralysis which is lack of use. There was no nystagmus—that is, as a child moves his eyes from side to side, there was no shaking of the eyes—and when he was asked to stand with his eyes closed he did not sway; that is known as the Rhomberg test; and then he was asked to stand and close his eyes, put his fingers on the nose—those are called pass-pointing tests; they were all done normal.

. . .

"Then he was asked to stand and stoop and bend several times, and that will sometimes bring out dizziness that the Rhomberg test, or standing with the eyes closed, does not bring out; and there was no evidence of that. All the neurological examination was negative.

"He weighed 50½ pounds and was 47 inches tall. Examination of the scalp was negative. His hearing was apparently good. His eyes were normal. I made no visual tests. There was a small flat scar over his upper forehead. His teeth were good for his age. His chest was negative; his heart was negative. The pulse was 82. The abdomen was negative. The urine showed a specific gravity of 10.82. Albumen and sugar were negative. Then I had X-rays taken of his skull by an X-ray specialist, Dr. Hartzell. Q. Did those demonstrate any evidence of fracture of any kind? A. No. Q. What is your conclusion, doctor, from your examination? A. Well, as I told you the neurological examination was negative. The mother says he has occasional headaches, and she thought he didn't have much pep; that may be true. That is what we call subjective—something that is told you —as compared to something that is objective, which would have been a change in the reflexes or some definite test.

"As far as I could tell, he seemed to be quite a normal boy."

Under cross-examination, he testified:

"Q. Doctor, would the fact you found no objective symp-

toms as you have said, would that indicate that this boy had no concussion at the time his head hit the fender of the car? A. Oh, no; not at all. Q. What? A. Not at all; not at all. He may have had a concussion. Q. Assuming that these headaches, which his mother has described to you, do occur, do you have any way of knowing that they would continue or that they will continue in the future? A. Well, you have to go a little further than that. Do you want me to try to answer it? If we assume that fact, that he had had headaches— Q. We assume that he did not have them before he sustained this injury. A. All right, we will assume that. Q. Yes. A. Now what was your question? Q. Do you have any way of telling if they will continue in the future, and if so, how long? A. Well, only based on past experience and of having seen a good many of these cases. I have seen of course cases where there are several injured where—if you are talking about concussion alone—where they continue for a long time. I have seen other cases where they cure up in a few weeks or a few months. You have to have a good deal more data before you could make a definite answer to that question."

As to instruction No. 13, it should be noted that it does not mention *permanent* disability. On the other hand, there was evidence which, if believed by the jury, would warrant its considering "future pain and suffering" and "impairment of physical vitality." The court was very particular in instructing the jury that it could not indulge in speculation or uncertainties, but could award damages only for such matters as were reasonably certain to happen as disclosed by the evidence. An almost identical instruction was approved by this court in *McDonough v. Pacific S. S. Co.,* 170 Wash. 658, 16 P. (2d) 1052.

Finally, appellants contend very strenuously that the court erred in not granting a new trial or in not reducing the size of the verdict. RCW 4.76.030 provides:

"If the trial court, upon a motion for new trial, finds the damages awarded by a jury to be so excessive or inadequate as unmistakably to indicate that the amount thereof must have been the result of passion or prejudice, the trial court may order a new trial or enter an order providing for a new trial unless the party adversely affected consents to a reduction or increase of the verdict, and if such party files such

consent and the opposite party thereafter appeals from the judgment entered, the party who filed such consent shall not be bound thereby, but upon the appeal the supreme court shall, without the necessity of a formal cross appeal, review *de novo* the action of the trial court in requiring such reduction or increase, and there shall be a presumption that the amount of damages awarded by the verdict of the jury was correct and such amount shall prevail, unless the supreme court finds from the record that the damages awarded in such verdict by the jury were so excessive or so inadequate as unmistakably to indicate that the amount of the verdict must have been the result of passion or prejudice."

We have also held that the trial court may, under its inherent power, and in the exercise of its discretion (exclusive of any statutory right), relieve a party where an injustice has been done in the awarding of an excessive verdict, by giving the prevailing party the option to accept a smaller amount or submit to a new trial. Our province in such a case is to review the discretion of the trial court. *Scobba v. Seattle*, 31 Wn. (2d) 685, 198 P. (2d) 805.

 In this case, one of the grounds in the motion for new trial was the following:

"5. Damages so excessive as unmistakably to indicate that the verdict must have been the result of passion or prejudice."

It is clear that the motion was based on the statute and was not addressed to the discretion of the trial court under its inherent power.

The order denying motion for new trial contained the following:

"(5) The damages awarded by the jury are not so excessive as unmistakably to indicate that the verdict must have been the result of passion or prejudice."

It may very well be that if we had been on the jury we might not have awarded damages in the amount of $5,000, and if any one of us had been the trial judge, he might have reduced the amount of the award. But we were not on the jury, and none of us was on the trial bench. The jury and the trial court saw and heard the witnesses. We did not. Although, as indicated before, we may feel that the amount

of the verdict was too high, still, we cannot find from the record that the damages awarded in the verdict by the jury were so excessive as *unmistakably* to indicate that the amount of the verdict must have been the result of passion or prejudice.

The judgment is affirmed.

GRADY, C. J., HAMLEY, and FINLEY, JJ., concur.

DONWORTH, J. (dissenting in part)—While I concur in affirming the judgment on the issue of liability, I am unable to agree with the portion of the majority opinion in which the court declines to review the amount of the jury's verdict.

It is held that the court in this case cannot find that the damages awarded were so excessive as *unmistakably* to indicate that the amount must have been the result of passion or prejudice.

Assuming *arguendo* that there is nothing in the record indicating that the jury was influenced by passion or prejudice, our function as an appellate court does not stop there.

In *Anderson v. Dalton,* 40 Wn. (2d) 894, 246 P. (2d) 853 (an *En Banc* decision) we reviewed our previous cases involving this problem and pointed out that there were two lines of cases dealing with the matter of excessive damages: A. Those cases in which damages have been regarded as excessive but not necessarily involving passion or prejudice (*Scobba v. Seattle,* 31 Wn. (2d) 685, 198 P. (2d) 805—cited by the majority in this case—being referred to as an example), *and* B. Those cases in which damages have been regarded as excessive and as having been given under the influence of passion or prejudice.

In that case, we summarized the pertinent decisions with this statement:

"In more than three-score cases, we have affirmed or ourselves made conditional reductions amounting to fifty per cent of the verdict. We have not, in our consideration of the present case, analyzed those cases to determine whether they fall in Class A (excessive verdicts without reference to passion or prejudice) or Class B (excessive verdicts which indicate passion or prejudice on the part of the juries).

"In eleven cases, we have required or upheld the requirement that more than fifty per cent of the verdict be remitted. In our opinions in nine of these, we made no reference to passion or prejudice, and they probably belong in Class A. [Citing cases.]

"In only two cases involving reductions of more than fifty per cent in verdicts have we said that there was passion or prejudice. [Citing cases.]"

More recently in *Kramer v. Portland-Seattle Auto Freight,* 43 Wn. (2d) 386, 261 P. (2d) 692, we set forth the matters to be considered by an appellate court in reviewing the alleged excessiveness of a verdict for damages for wrongful death where there is no showing of passion or prejudice as follows:

"On the one hand, the following must be considered: Each cause depends, to a large extent, upon its own facts and circumstances. The verdict must be compensatory of a pecuniary loss. *Walters v. Spokane International R. Co.,* 58 Wash. 293, 108 Pac. 593 (1910). It can be substantial (*Atkeson v. Jackson Estate,* 72 Wash. 233, 130 Pac. 102 (1913); *St. Germain v. Potlatch Lbr. Co.,* 76 Wash. 102, 135 Pac. 804 (1913); *Skeels v. Davidson,* 18 Wn. (2d) 358, 139 P. (2d) 301, 149 A.L.R. 225 (1943)) but not out of proportion to actual damages. *Halverson v. Seattle Electric Co.,* 35 Wash. 600, 77 Pac. 1058 (1904). The amount of the damage is within the discretion of the jury, under proper instructions. The jury is given considerable latitude in making such determination as to it seems just. *Aronson v. Everett,* 136 Wash. 312, 239 Pac. 1011 (1925); *Ticknor v. Seattle-Renton Stage Line,* 139 Wash. 354, 247 Pac. 1 (1926). The subject matter being difficult of proof, it cannot be fixed with mathematical certainty by the proof. Once the determination is made, an appellate court will give great weight to, and is reluctant to interfere with, the jury's verdict. *Kellerher v. Porter,* 29 Wn. (2d) 650, 189 P. (2d) 223 (1948).

"On the other hand, the balancing factor is the conscience of the appellate court, when there is an affirmative showing that passion and prejudice played no part in the jury's determination. Is the amount flagrantly outrageous and extravagant? Is it unjustified in the light of the evidence? Does it disclose circumstances foreign to proper jury deliberations? If it is and does, then it can be said to shock the sense of justice and sound judgment, and the verdict of the jury is excessive."

Applying these principles to the present case, I cannot find from the testimony relating to the boy's injuries anything to justify an award of five thousand dollars.

This testimony is quoted in the majority opinion and was given by the boy's parents and a physician who examined him seven months after the accident at the request of appellant.

In substance, it showed that the boy immediately after the accident in April, 1952, was taken to a hospital and was discharged on the same day. He was in bed at home for a week and returned to school the third week. His face was swollen, he had two black eyes, and his nose was also swollen. He had minor cuts on his face and his lip was cut. His knee bothered him, and he complained of headaches. He was restless in his sleep and started wetting his bed. His arm ached. He felt sleepy while at school.

The contusions and practically all the other items described above disappeared after five or six weeks. At the time of the trial (nearly a year after the accident), he still had two principal results of the accident: (a) occasional headaches, and (b) one leg that bothered him when walking or running a great deal.

The physician found no objective symptoms from his examination. He said: "As far as I could tell, he seemed to be quite a normal boy." He was unable to express an opinion as to whether the headaches would continue in the future without having a good deal more data.

Considering the nature and extent of these injuries (which I cannot believe from the evidence are permanent), I am reluctantly forced to the conclusion that the amount of the verdict is flagrantly extravagant and that it shocks the sense of justice and sound judgment.

I would remand the case to the trial court with instructions to give respondent the option of consenting to the entry of a judgment against appellants for the sum of $2,500, or, in the alternative, appellants would be granted a new trial limited to the issue of damages only.

April 30, 1954. Petition for rehearing denied.