NORTHERN PACIFIC RAILWAY COM-
PANY, a corporation,
Appellant,

v.

Ernest EVERETT, Appellee.

No. 14795.

United States Court of Appeals
Ninth Circuit.

April 24, 1956.

489

490

McKevitt, Snyder & Thomas, Spokane, Wash., for appellant.

R. Max Etter, Ellsworth I. Connelly, Spokane, Wash., for appellee.

Before HEALY and POPE, Circuit Judges, and MATHES, District Judge.

MATHES, District Judge.

This is an appeal from a judgment entered on a verdict for $8,632.76 damages, awarded by a jury for the wrongful death of appellee's sixteen-year-old daughter. Federal jurisdiction rests on diversity of citizenship. 28 U.S.C. § 1332.

The death of appellee's daughter was admittedly caused by injuries sustained in a crossing collision between a 1940 Dodge panel truck which she had been driving and one of appellant's trains. The collision occurred in mid-afternoon on a clear, dry day, at a point approximately 5 miles east of Ellensberg, Washington, where a country road running in a general northerly-southerly direction crosses appellant's tracks running in a general easterly-westerly direction.

The uncontradicted testimony discloses: that shortly prior to the collision appellee's daughter was driving the panel truck along the country road in a northerly direction, approaching the crossing at a speed of approximately ten miles per hour; that as the truck neared the roadbed, it slowed down or stopped, appeared to "buck up" onto the tracks, and stalled directly in the path of the west-bound train; that just before the impact the engineer saw the girl get out of the truck and take a few steps to the west, away from the tracks, in what appeared to be an unsuccessful attempt to reach a place of safety.

The case was submitted to the jury on three specifications of alleged negligence: (1) that on approaching the crossing appellant's engineer failed to sound an appropriate warning whistle or bell, as required by state statute; (2) that appellant negligently failed to maintain a safe roadway leading up to the tracks; and (3) that appellant's engineer negligently failed to stop the train or slacken speed after the truck stalled on the tracks.

The claimed grounds for reversal advanced by appellant are: that there was insufficient evidence to sustain a finding of any negligence on the part of appellant; that there was insufficient evidence to warrant submission of the last-clear-chance doctrine to the jury; that both appellee and appellee's daughter were guilty of contributory negligence barring recovery; and that the verdict is excessive.

Looking to the substantive law of the State of Washington, which rules this case, Erie R. Co. v. Tompkins, 1938, 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188; cf. Guaranty Trust Co. of N. Y. v. York, 1945, 326 U.S. 99, 108–109, 65 S.Ct. 1464, 89 L.Ed. 2079, appellant's contentions will be discussed in the order stated.

The evidence is conflicting as to the time when a warning whistle was sounded. Washington law requires that "every engineer driving a locomotive on any railway * * * [shall] ring the bell or sound the whistle upon such locomotive, or cause the same to be rung or sounded, at least 80 rods [1,323 feet] from any place where such railway crosses a traveled road or street * * [and] continue the ringing of such bell or sounding of such whistle until such locomotive has crossed such road or street * * *." R.C.W. § 81.48.010.

Both engineer and fireman testified that two long blasts of the whistle were

sounded as the train approached the railroad whistlepost, 1,323 feet east of the crossing, and that several subsequent blasts of the whistle were sounded as the train proceeded toward the crossing.

This testimony, if believed, would leave no question but that the train sounded the warning required by statute. However two disinterested witnesses, John and Lawrence O'Neil, who were working in a nearby field, testified that they didn't hear the train sound a warning whistle until it was about 500 or 600 feet from the crossing.

The jury could well have believed the O'Neils rather than the engineer and the fireman, and so could have found that had the whistle been blown at the distance from the crossing required by law, the girl would have had sufficient warning to permit her to flee the vehicle to safety. Hence the jury might reasonably have concluded that negligent failure to sound a timely whistle was a proximate cause of death.

Against this, it is urged that appellee was bound by the testimony of the engineer, since it was appellee who called him as a witness and elicited the engineer's testimony that the whistle was sounded as the statute requires.

Originally, the engineer had been joined as a co-defendant with appellant railroad, a Wisconsin corporation. But it later appeared that, like appellee, the engineer was a citizen of Washington, and he was voluntarily dismissed as a defendant in the action, presumably to maintain the diversity of citizenship requisite to federal jurisdiction. 28 U.S.C. § 1332; Horn v. Lockhart, 1873, 17 Wall. 570, 579, 84 U.S. 570, 579, 21 L.Ed. 657.

When appellee called the engineer as an adverse witness, the trial judge ruled that he was neither an adverse party nor an adverse witness within the meaning of Rule 43(b). Fed.R.Civ.Proc. Rule 43(b), 28 U.S.C.A. From this ruling, appellant reasons that the engineer was appellee's witness, and so that appellee was bound absolutely by the engineer's testimony.

No authority is cited in support of this contention. The rule that a party is morally bound by the statements of his own witness has been termed primitive and is no longer generally followed. [See 3 Wigmore, Evidence, § 897 (3d ed. 1940).]

Although Washington law, generally speaking, prohibits impeachment of one's own witness, State v. Thorne, 1953, 43 Wash.2d 47, 260 P.2d 331; State v. Swan, 1946, 25 Wash.2d 319, 171 P.2d 222; State v. Bossio, 1925, 136 Wash. 232, 239 P. 553, it is clear that appellee here made no attempt to impeach the engineer. Instead, appellee called two other witnesses whose testimony in regard to the sounding of the warning whistle differed from that of the engineer.

Hence, the engineer was contradicted, not impeached; and the doctrine, grounded in the common law, that even one's own witness may always be contradicted is the rule followed today. See Wigmore, op. cit. supra, §§ 907, 908.

As explained in Zumwalt v. Gardner, 8 Cir., 1947, 160 F.2d 298: "The engineer whom plaintiff was compelled to call as his witness was in the employ of the defendant and while plaintiff because of having called him, could not directly impeach him, he was not necessarily bound by his testimony. He could have offered testimony to contradict him." 160 F.2d at page 302.

Concerning the second specification of negligence, that appellant failed to maintain a safe crossing approach up to the tracks, it is said "there is an utter absence of evidence that this condition caused the truck to stall."

To the contrary, appellee himself testified that he took a measurement of the claimed defect in the roadway and found there was a jump-up of about five inches from the roadbed to the top of some planking laid across the roadway close

to the south rail; and to this was added without objection his opinion and argument that one had to shift down and apply additional acceleration to get over this hump, for there was "a very good chance of stalling your car if you didn't."

Furthermore, witness Lawrence O'Neil testified that when driving north over the crossing he customarily turned to the left hand side of the roadway to avoid the bump caused by the gap between the planking and the roadbed.

In addition, both engineer and fireman testified that appellee's slowly-moving truck appeared to "buck up" onto the crossing and stop, thus providing foundation for the rational inference that the vehicle stalled when the wheels hit the planking. Finally, a photograph was in evidence, said to depict fairly the state of the crossing at the time of the collision.

 We conclude there was ample evidence to sustain a finding that the railroad negligently failed to maintain at the crossing a proper and safe roadway leading up the south rail; and a further finding as well that this negligent omission was a proximate cause of the death of appellee's daughter.

As to the third specification, that appellant negligently failed to stop the train or slacken its speed after the truck stalled on the tracks, the engineer testified in effect that when he first saw the truck approach the crossing he made a service, as distinguished from an emergency, application of his brakes, and that when he observed the truck momentarily stop or slow down before reaching the tracks, he released the brakes, but as he released the braking the truck "bucked" onto the tracks, and he immediately thereafter applied full emergency braking to the train, failing to stop in time to avoid crashing into the stalled truck.

But the engineer's testimony on this subject does not stand alone. Indeed, appellant introduced evidence casting doubt upon the accuracy of some of the engineer's observations.

This evidence consisted of a speed tape, a virtually fool-proof mechanical device which registers the speed of a train at each interval of distance along the run. From markings on this tape the speed of the train at any given spot can be computed; also the points at which braking was applied and deceleration occurred.

Appellant qualified an expert witness who described the operation of the speed tape, and reconstructed for the jury the operation and various speeds of the train on the run to the point where it was stopped after the collision. The speed tape showed significantly that there had been a service application of the brakes as the engineer had testified, but that the brakes were released 2,640 feet, or about one-half mile, from the crossing.

It was at this point, the engineer testified, as braking was released following the service application, that he saw the truck "buck up" onto the crossing. It follows then that when the engineer first saw the truck stall on the tracks, the train was not assuredly "about 600 feet from the crossing", as the engineer testified, but most probably about one-half mile from the crossing, as the tape showed.

The distance of the train from the crossing when the truck stalled on the tracks is of crucial importance of course, in determining whether the emergency brakes were applied without excusable delay. The speed tape revealed that the train was going 60 miles per hour when the brakes were released following the service application, and that the speed gradually increased to 64 miles per hour recorded at the point of impact with the truck.

Appellant's expert witness testified that the speed tape disclosed the emergency braking did not begin to take hold until the train had reached the point of impact. He explained this delay by pointing out that in the operation of the

type of brakes employed on appellant's train there is what is known as an equipment lag, an interval of approximately three and one-half seconds between the time when the brakes are applied and when they take hold; also that there is an average human-reaction lag of some two seconds for a man to "let go of the whistle" and reach over to apply the brake; and that the mechanical lag plus the human lag in this case would be about five and one-half seconds.

So if the truck were stalled on the tracks for a period of appreciably more than five and one-half seconds prior to the impact, and the engineer, seeing the deceased in a position of great peril, had applied the brakes promptly, then the speed of the train would have been slackened before the impact. And since appellee's daughter was out of the truck and running for safety when the collision occurred, a split-second delay in the arrival of the train might have saved her life.

■ Bearing in mind: that the engineer testified he saw the stalled truck on the tracks as he released the braking; that according to the speed tape the service application of the brakes was released at a point 2,640 feet distant from the crossing; and that the train traveling from 60 to 64 miles per hour negotiated the 2,640 feet in 28 to 30 seconds; the jury might reasonably have concluded that the engineer saw the truck on the crossing some 25 seconds before the collision, but did not reach for his brake until some 5 seconds before the collision; and that this 20-second delay was negligence which was a proximate cause of the death.

■ Appellant next urges that in all events there was not sufficient evidence to warrant submission to the jury of the doctrine of last-clear-chance. This doctrine applies, under Washington law, when both parties are negligent but one party, seeing the peril of the other and appreciating the danger, fails to exercise due care to avoid injury.

■ Liability is then cast on the party who, appreciating the danger, had the later chance to avoid the injury, even though the other's negligence may have continued up to the instant of the injury. See: Leftridge v. City of Seattle, 1924, 130 Wash. 541, 228 P. 302. Appellant does not challenge the content of the instruction given by the learned trial judge as to this doctrine, but contends that there was insufficient evidence to warrant its submission to the jury.

The evidence in the case is such that the jury might reasonably have found: that the railroad was initially negligent in failing to maintain a safe roadway leading to the crossing, and that the deceased was also guilty of negligence either in failing to see the oncoming train or in attempting to drive across the tracks with the train approaching; next that the truck stalled on the crossing when the train was one-half mile away and that the engineer seeing the truck stalled on the tracks and aware of the deceased's peril, negligently failed to apply the brakes in time to delay the arrival of the train at the point of impact.

Or the jury might reasonably have found that while the deceased was in the truck stalled on the tracks, unaware of the approach of the train, the engineer, seeing her peril, negligently failed to blow the whistle at the required statutory distance from the crossing, when to have done so would have warned the deceased of the approach of the train in time for her to have fled the truck sooner than she did, and to safety.

■ Either of the two theories stated would warrant invoking the doctrine of last-clear-chance.

However, appellant presses the further view that the evidence shows the deceased was contributorily negligent in remaining with the truck too long as the train approached, and that her negligence, concurring with that of appellant to the last moment, eliminated the applicability of the doctrine of last-clear-

chance. See Moore v. Atlantic Coast Line R. Co., 1931, 201 N.C. 26, 31, 158 S.E. 556, 558.

Since death has closed the lips of the deceased, the evidence does not reveal at what point she became aware of the approaching train, and of the necessity of removing herself from danger. Cf. Stefan v. Elgin, Joliet & Eastern Ry. Co., 1954, 2 Ill.App.2d 300, 120 N.E.2d 52. Clearly, then, the evidence is not such as to require the jury to find that appellee's daughter, who was admittedly in the process of fleeing for her life when the collision occurred, was negligent in failing to act more promptly.

Also assigned as error is the refusal of the trial judge to instruct the jury that if they found the deceased did not have a driver's license and that appellee knew she did not have one, but permitted her to operate the vehicle notwithstanding, then appellee was himself guilty of contributory negligence *per se,* barring his recovery.

The argument is that Washington law makes it negligence *per se* for the owner of a motor vehicle to entrust it to an unfit person or a minor under the age specified by statute, and that the statute itself constitutes a conclusive declaration that an individual younger than the age designated is incompetent to drive a motor vehicle. Atkins v. Churchill, 1948, 30 Wash.2d 859, 865, 194 P.2d 364, 368.

But the age specified by statute is "under the age of sixteen." R.C.W. § 46.20.030. So a person sixteen years or older can get a license, and the uncontradicted evidence discloses that the deceased was sixteen years and eleven months of age at the time of the accident. In the absence of any evidence showing that the deceased was otherwise unfit to drive, the trial judge correctly refused the requested instruction.

The final contention is that the general damages of $8,000 awarded appellee for the death of his daughter are excessive. The Washington wrongful death statute, which permits a father to maintain an action as plaintiff for the injury or death of his minor child, does not prescribe any measure of recovery. R.C.W. § 4.24.010.

The standard of recovery is that evolved by the Supreme Court of Washington in Hedrick v. Ilwaco Ry. & Nav. Co., 1892, 4 Wash. 400, 30 P. 714, and followed in subsequent decisions. See Skeels v. Davidson, 1943, 18 Wash.2d 358, 139 P.2d 301, 149 A.L.R. 225; Skidmore v. City of Seattle, 1926, 138 Wash. 340, 244 P. 545; Atrops v. Costello, 1894, 8 Wash. 149, 35 P. 620. By that standard the measure of appellee's recovery here would be the reasonably-anticipated value of the services of the child from the date of her death until she would have attained the age of majority, less the reasonably-anticipated cost to the parents of her support and maintenance during this interval.

But inasmuch as strict application of this measure of recovery "would result in no damages, except in the cases of a few gifted children employed in the entertainment field", Skeels v. Davidson, supra, 18 Wash.2d at page 369, 139 P.2d at page 306, the rule has been liberalized to allow a judgment for "substantial damages" in all cases where death of the child is proximately caused by negligence of another. Skeels v. Davidson, supra, 18 Wash.2d 358, 139 P.2d 301; Sweeten v. Pacific Power & Light Co., 1915, 88 Wash. 679, 153 P. 1054; Atkeson v. Jackson Estate, 1913, 72 Wash. 233, 130 P. 102; Atrops v. Costello, supra, 8 Wash. 149, 35 P. 620.

In such cases the Washington courts permit the jury, in forming an estimate of the pecuniary loss resulting to the parent from the wrongful death, to consider the "age, health, and capacity of the child and the situation of the parent." Sweeten v. Pacific Power & Light Co., supra, 88 Wash. at page 683, 153 P. at page 1055.

The evidence at bar discloses without dispute that at the time of her death, appellee's daughter was living with her family on a farm, and attending high school; also that she was an

attractive, physically healthy girl of almost seventeen, and helped her father considerably with the farm work.

The trial judge correctly instructed the jury as to the measure of damages under the law of Washington, and warned them not to consider any distress, sorrow or mental suffering caused by the death of the daughter.

Appellant moved for a directed verdict upon the close of the evidence and, after verdict, for a judgment notwithstanding the verdict or, in the alternative, for a new trial upon the grounds *inter alia* that "there is no sufficient or substantial evidence to support the amount of the jury's verdict", and that "the verdict is excessive and appears to have been given under the influence of passion and prejudice."

The able and experienced trial judge reviewed the evidence in the face of these contentions and found no cause to grant a new trial.

The judgment would not be set aside in the Supreme Court of Washington as being excessive, unless it affirmatively appeared that the amount of the verdict was the result of passion or prejudice, or so grossly exceeded a just award that this result must be presumed. Scholz v. Leuer, 1941, 7 Wash. 2d 76, 109 P.2d 294; Sweeten v. Pacific Power & Light Co., supra, 88 Wash. 679, 153 P. 1054.

It is unnecessary now to determine whether state law should govern the scope of review of the amount awarded in a diversity case, cf. Guaranty Trust Co. of N. Y. v. York, supra, 326 U.S. at pages 111–112, 65 S.Ct. at pages 1470–1471, 89 L.Ed. 2079; Minneapolis, St. P. & S. S. M. R. Co. v. Moquin, 1931, 283 U.S. 520, 51 S.Ct. 501, 75 L.Ed. 1243; Covey Gas & Oil Co. v. Checketts, 9 Cir., 1951, 187 F.2d 561, since here identical criteria rule the review of an award in both this and the State Court. Southern Ry.—Carolina Division v. Bennett, 1914, 233 U.S. 80, 87, 34 S.Ct. 566, 58 L.Ed. 860; Bradley Min. Co. v. Boice, 9 Cir., 1951, 194 F.2d 80, 83; Southern Pac. Co. v. Guthrie, 9 Cir., 186 F.2d 926, 930–933, certiorari denied, 1951, 341 U.S. 904, 71 S.Ct. 614, 95 L.Ed. 1343.

We find nothing in the record at bar which indicates that the jury labored under passion or prejudice or other extraneous influence, or that the jury in any way failed to function as that age-old institution is intended to function. See Neese v. Southern Ry. Co., 1955, 350 U.S. 77, 76 S.Ct. 131, reversing 4 Cir., 1954, 216 F.2d 772.

Worth repeating is the admonition that: "Appellate courts should be slow to impute to juries a disregard of their duties, and to trial courts a want of diligence or perspicacity in appraising the jury's conduct." Fairmount Glass Works v. Cub Fork Coal Co., 1933, 287 U.S. 474, 485, 53 S.Ct. 252, 255, 77 L.Ed. 439.

And it may well be added: "Universal distrust creates universal incompetence. In the courts of the United States the judge and jury are assumed to be competent to play the parts that always have belonged to them in the country in which the modern jury trial had its birth." Graham v. United States, 1913, 231 U.S. 474, 480, 34 S.Ct. 148, 151, 58 L.Ed. 319.

The judgment of the District Court is affirmed.